Scileppi, J.
Both cases arise out of the 1969 amendments to the Town of Ramapo’s Zoning Ordinance. In Golden, petitioners, the owner of record and contract vendee, by way of a proceeding pursuant to CPLR article 78 sought an order reviewing and annulling a decision and determination of the Planning Board of the Town of Ramapo which denied their application for preliminary approval of a residential subdivision plat because of an admitted failure to secure a special permit as required by section 46-13.1 of the Town zoning ordinance prohibiting subdivision approval except where the residential developer has secured, prior to the application for plat approval, a special permit or a variance pursuant to section F of the ordinance. Special Term sustained the amendments and granted summary judgment. On appeal, the Appellate Division elected, since all necessary parties were before the court, to treat the proceeding as an action for declaratory judgment and reversed.
*365 The plaintiffs in Rockland County Builders Association, on the other hand, sought, in an action for declaratory judgment, to set aside the ordinance as unconstitutional and commenced the present action after the Planning Board had denied plaintiff Mildred Rhodes preliminary plat approval for her parcel of property because of a conceded failure on her part to obtain a special permit as required under the challenged ordinance. The remaining plaintiffs, Rockland County Builders Association, a membership corporation composed of builders engaged in the purchase of land and construction of residences of all types through the Town, as well as the Eldorado Developing Corporation, possessed of some 12 acres situate within the Town, apparently have never made application for approval of a plat and have never sought a special permit, as a prerequisite to such approval. Special Term, concluding that the constitutional attack was premature because of the asserted failure to exhaust administrative remedies (cf. Old Farm Road v. Town of New Castle, 26 N Y 2d 462), denied their motion for summary judgment and granted defendants’ cross motion to dismiss. On appeal, the Appellate Division held that the parties were presently aggrieved and relying on Golden, reversed and granted plaintiffs’ motion for summary judgment.
Among the complaining parties, Rockland County Builders is not a property owner and Eldorado has never sought preliminary approval of a subdivision plat. Petitioner Golden and plaintiff Rhodes have both sought plat approval and have been denied the same for failure to apply for a special permit. Though the builders are obviously not aggrieved by the recent amendments, landowners prior to gaining approval for subdivision, of necessity, would be required to apply for a special permit, which, absent certain enumerated improvements would invariably be denied. The prescription is mandatory and, were we to conclude that the standards established for the permit’s issuance were unconstitutional, quite unlike the situation obtaining in Old Farm Road v. Town of New Castle (26 N Y 2d 462, supra), the ordinance itself could admit of no constitutionally permissible construction so as to require initial administrative relief to determine whether injury has occurred (id., at p. 464). The attack by the subdividing landowner is directed against the ordinance in its entirety, and the thrust of the petition and *366 complaint, respectively, is that the ordinance of itself operates to destroy the value and marketability of the subject premises for residential use and thus constitutes a present invasion of the property rights of the complaining landholders. The alleged harm is thus immediate and is sufficient to raise a justiciable issue as to the validity of the subject ordinance (see Euclid v. Ambler Co., 272 U. S. 365, 386; Scarsdale Supply Co. v. Village of Scarsdale, 8N Y2d 325, 327; Dowsey v. Village of Kensington, 257 N. Y. 221, 226; Ulmer Park Realty Co. v. City of New York, 267 App. Div. 291, 293-294).
Experiencing the pressures of an increase in population and the ancillary problem of providing municipal facilities and services[1], the Town of Eamapo, as early as 1964, made application for grant under section 801 of the Housing Act of 1964 (78 U. S. Stat. 769) to develop a master plan. The plan’s preparation included a four-volume study of the existing land uses, public facilities, transportation, industry and commerce, housing needs and projected population trends. The proposals appearing in the studies were subsequently adopted pursuant to section 272-a of the Town Law in July, 1966 and implemented by way of a master plan. The master plan was followed by the adoption of a comprehensive zoning ordinance. Additional sewage district and drainage studies were undertaken which culminated in the adoption of a capital budget, providing for the development of the improvements specified in the master plan within the next six years. Pursuant to sec *367 tion 271 of the Town Law, authorizing comprehensive planning, and as a supplement to the capital budget, the Town Board adopted a capital program which provides for the location and sequence of additional capital improvements for the 12 years following the life of the capital budget. The two plans, covering a period of 18 years, detail the capital improvements projected for maximum development and conform to the specifications set forth in the master plan, the official map and drainage plan.
Based upon these criteria, the Town subsequently adopted the subject amendments for the alleged purpose of eliminating premature subdivision and urban sprawl. Residential development is to proceed according to the provision of adequate municipal facilities and services, with the assurance that any concomitant restraint upon property use is to be of a “ temporary ” nature and that other private uses, including the construction of individual housing, are authorized.
The amendments did not rezone or reclassify any land into different residential or use districts[2], but, for the purposes of *368 implementing the proposals appearing in the comprehensive plan, consist, in the main, of additions to the definitional sections of the ordinance, section 46-3, and the adoption of a new class of “Special Permit Uses”, designated “Residential Development Use. ” “ Residential Development Use ’ ’ is defined as “ The erection or construction of dwellings or any vacant plots, lots or parcels of land ” (§ 46-3, as amd.); and, any person who acts so as to come within that definition, “ shall be deemed to be engaged in residential development which shall be a separate use classification under this ordinance and subject to the requirement of obtaining a special permit from the Town Board ” (§ 46-3, as amd.).
The standards for the issuance of special permits are framed in terms of the availability to the proposed subdivision plat of five essential facilities or services: specifically (1) public sanitary sewers or approved substitutes; (2) drainage facilities; (3) improved public parks or recreation facilities, including public schools; (4) State, county or town roads—major, secondary or collector; and, (5) firehouses. No special permit shall issue unless the proposed residential development has accumulated 15 development points, to be computed on a sliding scale of values assigned to the specified improvements under the statute. Subdivision is thus a function of immediate availability to the proposed plat of certain municipal improvements; the avowed purpose of the amendments being to phase residential development to the Town’s ability to provide the above facilities or services.
Certain savings and remedial provisions are designed to relieve of potentially unreasonable restrictions. Thus, the board may issue special permits vesting a present right to proceed with residential development in such year as the development meets the required point minimum, but in no event later than the final year of the 18-year capital plan. The approved special use permit is fully assignable, and improvements scheduled for completion within one year from the date of an application are to be credited as though existing on the date of the application. A prospective developer may advance the date of subdivision approval by agreeing to provide those *369 improvements which will bring the proposed plat within the number of development points required by the amendments. And applications are authorized to the ‘ ‘ Development Basement Acquisition Commission ” for a reduction of the assessed valuation. Finally, upon application to the Town Board, the development point requirements may be varied should the board determine that such a variance or modification is consistent with the on-going development plan.
The undisputed effect of these integrated efforts in land use planning and development is to provide an over-all program of orderly growth and adequate facilities through a sequential development policy commensurate with progressing availability and capacity of public facilities. While its goals are clear and its purposes undisputably laudatory, serious questions are raised as to the manner in which these ends are to be effected, not the least of which relates to their legal viability under present zoning enabling legislation, particularly sections 261 and 263 of the Town Law. The owners of the subject premises argue, and the Appellate Division has sustained the proposition, that the primary purpose of the amending ordinance is to control or regulate population growth within the Town and as such is not within the authorized objectives of the zoning enabling legislation. We disagree.
In enacting the challenged amendments, the Town Board has sought to control subdivision in all residential districts, pending the provision (public or private) at some future date of various services and facilities. A reading of the relevant statutory provisions reveals that there is no specific authorization for the “ sequential ” and “ timing ” controls adopted here. That, of course, cannot be said to end the matter, for the additional inquiry remains as to whether the challenged amendments find their basis within the perimeters of the devices authorized and purposes sanctioned under current enabling legislation. Our concern is, as it should be, with the effects of the statutory scheme taken as a whole and its role in the propagation of a viable policy of land use and planning.
Towns, cities and villages lack the power to enact and enforce zoning or other land use regulations (Matter of Barker v. Switzer, 209 App. Div. 151, 153; cf. De Sena v. Gulde, 24 A D *370 2d 165, 171). The exercise of that power, to the extent that it is lawful, must he founded upon a legislative delegation to so proceed, and in the absence of such a grant will be held ultra vires and void (Matter of Barker v. Switzer, 209 App. Div. 151, 153, supra; Albrecht Realty v. Town of New Castle, 8 Misc 2d 255; Village of Granville v. Krause, 131 Misc. 752; see, also, 1 Anderson, The American Law of Zoning [1968], § 3.02; 1 Rathkopf, The Law of Zoning and Planning [3d ed.], pp. 3-1 through 3-14). That delegation, set forth in section 261[3] of the Town Law, is not, however, coterminous with stated police power objectives and has been considered less inclusive traditionally. Hence, although the power to zone must be exercised under the aegis of the police power, indeed must inevitably find justification for its exercise in some aspect of the same, the recital of police power purposes in the grant, attests more to the drafters ’ attempts to specify a valid constitutional predicate than to detail authorized zoning purposes[4] . The latter, “ legitimate zoning purposes,” are incorporated in accompanying section 263 and are designed to secure safety from various calamities, to avoid undue concentration of population and to facilitate ‘ ‘ adequate provision of transportation, water, sewerage, schools, parks and other public requirements ” (Town Law, § 263). In the end, zoning properly effects, and only in the manner prescribed, those purposes detailed under section 263 of the Town Law. It may not be invoked to further the *371 general police powers of a municipality (see, e.g., Westwood Forest Estates v. Village of South Nyack, 23 N Y 2d 424)[5].
Even so, considering the activities' enumerated by section 261 of the Town Law, and relating those powers to the authorized purposes detailed in section 263, the challenged amendments are proper zoning techniques, exercised for legitimate zoning purposes. The power to restrict and regulate conferred under section 261 includes within its grant, by way of necessary implication, the authority to direct the growth of population for the purposes indicated, within the confines of the township. It is the matrix of land use restrictions, common to each of the enumerated powers and sanctioned goals, a necessary concomitant to the municipalities ’ recognized authority to determine the lines along which local development shall proceed, though it may divert it from its natural course (Euclid v. Ambler Co., 272 U. S. 365, 389-390, supra)[6].
*372 Of course, zoning historically has assumed the development of individual plats and has proven characteristically ineffective in treating with the problems attending subdivision and development of larger parcels, involving as it invariably does, the provision of adequate public services and facilities. To this end, subdivision control (Town Law, §§ 276, 277) purports to guide community development in the directions outlined here, while at the same time encouraging the provision of adequate facilities for the housing, distribution, comfort and convenience of local residents (Village of Lynbrook v. Cadoo, 252 N. Y. 308, 314). It reflects in essence, a legislative judgment that the development of unimproved areas be accompanied by provision of essential facilities (Matter of Brous v. Smith, 304 N. Y. 164; see, also, 3 Rathkopf, The Law of Zoning and Planning [3d ed.], pp. 71-1 to 71-7; Cutler, Legal and Illegal Methods for Controlling Community Growth on the Urban Fringe, 1961 Wis. L. Rev. 370). And though it may not, in a definitional or conceptual sense be identified with the power to zone, it is designed to complement other land use restrictions, which, taken together, seek to implement a broader, comprehensive plan for community development (see Haar, The Master Plan: An Impermanent Constitution, 20 Law & Contemp. Probs. 353).
It is argued, nevertheless, that the timing controls currently in issue are not legislatively authorized since their effect is to *373 prohibit subdivision absent precedent or concurrent action of the Town, and hence constitutes an unauthorized blanket interdiction against subdivision.
It is, indeed, true that the Planning Board is not in an absolute sense statutorily authorized to deny the right to subdivide. That is not, however, what is sought to be accomplished here. The Planning Board has the right to refuse approval of subdivision plats in the absence of those improvements specified in section 277, and the fact that it is the Town and not the subdividing owner or land developer who is required to make those improvements before the plat will be approved cannot be said to transform the scheme into an absolute prohibition any more than it would be so where it was the developer who refused to provide the facilities required for plat approval.[7] Denial *374 of subdivision plat approval, invariably amounts to a prohibition against subdivision, albeit a conditional one (Beal Property Law, §§ 334-a, 335; see, also, 3 Bathkopf, Law of Zoning and Planning [3d ed.], p. 71-122, supra); and to say that the Planning Board lacks the authority to deny subdivision rights is to mistake the nature of our inquiry which is essentially whether development may be conditioned pending the provision by the municipality of specified services and facilities. Whether it is the municipality or the developer who is to provide the improvements, the objective is the same—to provide adequate facilities, off-site and on-site; and in either case subdivision rights are conditioned, not denied.
Undoubtedly, current zoning enabling legislation is burdened by the largely antiquated notion which deigns that the regulation of land use and development is uniquely a function of local government—that the public interest of the State is exhausted once its political subdivisions have been delegated the authority to zone (ALI, A Model Land Development Code [Tent. Draft No. 1], Intro. Mem., p. xxi). While such jurisdictional allocations may well have been consistent with formerly prevailing conditions and assumptions, questions of broader public interest have commonly been ignored (ALI, A Model Land Development Code [Tent. Draft No. 1], Intro. Mem., p. xxi; see, also, Boberts, Demise of Property Law, 57 Cornell L. Bev. 1, 19, 21; B. Babcock, The Zoning Game [1966], p. 19).
Experience, . over the last quarter century, however, with greater technological integration and drastic shifts in population distribution has pointed up serious defects and community autonomy in land use controls has come under increasing attack by legal commentators, and students of urban problems alike, because of its pronounced insularism and its correlative role in producing distortions in metropolitan growth patterns, and perhaps more importantly, in crippling efforts toward regional and State-wide problem solving, be it pollution, decent housing, or public transportation (ALI, A Model Land Development Code [Tent. Draft No. 2, April 24, 1970], Intro. Mem., p. xv, citing Beport of National Comm, on Urban Problems [Douglas Comm.], Building the American City [1969]; see, also, New York State Planning Law Bevision Study, Study Doc. No. 4 [New York State Office of Planning Coordination, Feb., 1970]).
*375 Recognition of communal and regional interdependence, in turn, has resulted in proposals for schemes of regional and State-wide planning, in the hope that decisions would then correspond roughly to their level of impact (see, e.g., Proposed Land Use and Development Planning Law, §§ 2-102, L-101, L-102; ALI, A Model Land Development Code, art. 7)[8]. Yet, as salutary as such proposals may be, the power to zone under current law is vested in local municipalities, and we are constrained to resolve the issues accordingly. What does become more apparent in treating with the problem, however, is that though the issues are framed in terms of the developer’s due process rights, those rights cannot, realistically speaking, be viewed separately and apart from the rights of others “ ‘ in search of a [more] comfortable place to live.’” (Concord Twp. Appeal, 439 Pa. 466, 474, n. 6, supra; National Land & Inv. Co. v. Easttown Twp. Bd. of Adj., 419 Pa. 504, 527-528, supra; see, generally, Sager, Tight Little Islands: Exclusionary Zoning, Equal Protection and the Indigent, .21 Stan. L. Rev. 767; Roberts, Demise of Property Law, 57 Cornell L. Rev. 1).
There is, then, something inherently suspect in a scheme which, apart from its professed purposes, effects a restriction upon the free mobility of a people until sometime in the future when projected facilities are available to meet increased demands. Although zoning must include schemes designed to allow municipalities to more effectively contend with the increased demands of evolving and growing communities, under its guise, townships have been wont to try their hand at an array of exclusionary devices in the hope of avoiding the very burden which growth must inevitably bring (see National Land & Inv. Co. v. Easttown Twp. Bd. of Adj., 419 Pa. 504, 532, supra; Girsh Appeal, 437 Pa. 237; Concord Twp. Appeal, 439 Pa. 466, supra; see, also, Roberts, Demise of Property Law, 57 Cornell L. Rev. 1, 5). Though the conflict engendered by such tactics is certainly real, and its implications vast, accumulated evidence, scientific *376 and social, points circumspectly at the hazards of undirected growth and the naive, somewhat nostalgic imperative that egalitarianism is a function of growth. (See, generally, Lewis, Ecology and Politics: II, New York Times, March 6, 1972, p. 33, cols. 1, 2.)
Of course, these problems cannot be solved by Ramapo or any single municipality, but depend upon the accommodation of widely .disparate interests for their ultimate resolution. To that end, State-wide or regional control of planning would insure that interests broader than that of the municipality underlie various land use policies. Nevertheless, that should not be the only context in which growth devices such as these, aimed at population assimilation, not exclusion, will be sustained; especially where, as here, we would have no alternative but to strike the provision down in the wistful hope that the efforts of the State Office of Planning Coordination and the American Law Institute will soon bear fruit.
Hence, unless we are to ignore the plain meaning of the statutory delegation, this much is clear: phased growth is well within the ambit of existing enabling legislation. And, of course, it is no answer to point to emergent problems to buttress the conclusion that such innovative schemes are beyond the perimeters of statutory authorization. These considerations, admittedly real, to the extent which they are relevant, bear solely upon the continued viability of ‘ ‘ localism ’ ’ in land use regulation; obviously, they can neither add nor detract from the initial grant of authority, obsolescent though it may be. The answer which Ramapo has posed can by no means be termed definitive; it is, however, a first practical step toward controlled growth achieved without forsaking broader social purposes.
The evolution of more sophisticated efforts to contend with the increasing complexities of urban and suburban growth has been met by a corresponding reluctance upon the part of the judiciary to substitute its judgment as to the plan’s over-all effectiveness for the considered deliberations of its progenitors (see, e.g., National Land & Inv. Co. v. Easttown Typ. Bd. of Adj., 419 Pa. 504, 521, supra). Implicit in such a philosophy of judicial self-restraint is the growing awareness that matters of land use and development are peculiarly within the expertise of students of city and suburban planning, and thus well within *377 the legislative prerogative, not lightly to be impeded (Rodgers v. Village of Tarrytown, 302 N. Y. 115, 121; Matter of Wulfsohn v. Burden, 241 N. Y. 288, 296-297). To this same end, we have afforded ■such regulations, the usual presumption of validity attending the exercise of the police power, and have cast the burden of proving their invalidity upon the party challenging their enactment (Udell v. Haas, 21 N Y 2d 463, 471, supra; Rodgers v. Village of Tarrytown, 302 N. Y. 115, supra; Shepard v. Village of Skaneateles, 300 N. Y. 115, 118). Deference in the matter of the regulations ’ over-all effectiveness, however, is not to be viewed as an abdication of judicial responsibility, and ours remains the function of defining the metes and bounds beyond which local regulations may not venture, regardless of their professedly beneficent purposes.
The subject ordinance is said to advance legitimate zoning purposes as it assures that each new home built in the township will have at least a minimum of public services in the categories regulated by the ordinance. The Town argues that various public facilities are presently being constructed but that for want of time and money it has been unable to provide such services and facilities at a pace commensurate with increased public need. It is urged that although the zoning power includes reasonable restrictions upon the private use of property, exacted in the hope of development according to well-laid plans, calculated to advance the public welfare of the community in the future (Arverne Bay Constr. Co. v. Thatcher, 278 N. Y. 222, 229; Hesse v. Rath, 249 N. Y. 436, 438), the subject regulations go further and seek to avoid the increased responsibilities and economic burdens which time and growth must ultimately bring (see National Land & Inv. Co. v. Easttown Twp. Bd. of Adj., 419 Pa. 504, 532, supra; Girsh Appeal, 437 Pa. 237, supra; Concord Twp. Appeal, 439 Pa. 466, supra).
It is the nature of all land use and development regulations to circumscribe the course of growth within a particular town or district and to that extent such restrictions invariably impede the forces of natural growth (Euclid v. Ambler Co., 272 U. S. 265, supra; National Land & Inv. Co. v. Easttown Twp. Bd. of Adj., 419 Pa. 504, 532, supra). Where those restrictions upon the beneficial use and enjoyment of land are necessary to pro *378 mote the ultimate good of the community and are within the bounds of reason, they have been sustained. “Zoning [,however,] is a means by which a governmental body can plan for the future — it may not be used as a means to deny the future ” National Land & Inv. Co. v. Easttown Twp. Bd. of Adj., 419 Pa. 504, 528, supra). Its exercise assumes that development shall not stop at the community’s threshold, but only that whatever growth there may be shall proceed along a predetermined course (Euclid v. Ambler Co., 272 U. S. 365, 387, supra). It is inextricably bound to the dynamics of community life and its function is to guide, not to isolate or facilitate efforts at avoiding the ordinary incidents of growth. What segregates permissible from impermissible restrictions, depends in the final analysis upon the purpose of the restrictions and their impact in terms of both the community and general public interest (see Euclid v. Ambler Co., 272 U. S. 365, 387, supra). The line of delineation between the two is not a constant, but will be found to vary with prevailing circumstances and conditions (see, e.g., Euclid v. Ambler Co., 272 U. S. 365, 387, supra; Rodgers v. Village of Tarrytown, 302 N. Y. 115, supra).
What we will not countenance, then, under any guise, is community efforts at immunization or exclusion. But, far from being exclusionary, the present amendments merely seek, by the implementation of sequential development and timed growth, to provide a balanced cohesive community dedicated to the efficient utilization of land. The restrictions conform to the community’s considered land use policies as expressed in its comprehensive plan and represent a bona fide effort to maximize population density consistent with orderly growth. True other alternatives, such as requiring off-site improvements as a prerequisite to subdivision, may be available, but the choice as how best to proceed, in view of the difficulties attending such exactions (see Heyman & Grilhool, The Constitutionality of Imposing Increased Community Costs on New Suburban Residents through Subdivision Exactions, 73 Yale L. J. 5.1119; see, also, ALI, A Model Land Development Code, § 3-104, subd. [6]), cannot be faulted.
Perhaps even more importantly, timed growth, unlike the minimum lot requirements recently struck down by the Pennsyl *379 vania Supreme Court as exclusionary, does not impose permanent restrictions upon land use (see National Land & Inv. Co. v. Easttown Twp. Bd. of Adj., 419 Pa. 504, supra; Concord Twp. Appeal, 439 Pa. 466, supra). Its obvious purpose is to prevent premature subdivision absent essential municipal facilities and to insure continuous development commensurate with the Town’s obligation to provide such facilities. They seek, not to freeze population at present levels but to maximize growth by the efficient use of land, and in so doing testify to this community’s continuing role in population assimilation. In sum, Ramapo asks not that it be left alone, but only that it be allowed to prevent the kind of deterioration that has transformed well-ordered and thriving residential communities into blighted ghettos with attendant hazards to health, security and social stability—a danger not without substantial basis in fact.
We only require that communities confront the challenge of population growth with open doors. Where in grappling with that problem, the community undertakes, by imposing temporary restrictions upon development, to provide required municipal services in a rational manner, courts are rightfully reluctant to strike down such schemes. The timing controls challenged here parallel recent proposals put forth by various study groups and have their genesis in certain of the pronouncements of this and the courts of sister States (see Proposed Land Use and Development Planning Law, § 2-105, subds. 1, 2, par. [a], as proposed by Sen. No. 9028 of 1970 Legislature; ALI, A Model Land Development Code [Tent. Draft No. 2, April, 1970], §§ 2-101, 2-201, subd. [2], par. [c]; § 2-206; [Tent. Draft No. 1, April, 1968], §§ 3-101, 3-103, 3-104, 3-107, 3-108; see Westwood Forest Estates v. Village of South Nyack, 23 N Y 2d 424, 427, supra; Concord Twp. Appeal, 439 Pa. 466, 475, supra; National Land & Inv. Co. v. Easttown Twp. Bd. of Adj., 419 Pa. 504, 532, supra). While these controls are typically proposed as an adjunct of regional planning (see Proposed Land Use and Development Planning Law, arts. 3, 4; ALI, A Model Land Development Code, art. 7), the preeminent protection against their abuse resides in the mandatory on-going planning and development requirement, present here, *380 which attends their implementation and use (see, e.g., Proposed Land Use and Development Planning Law, § 2-105).
We may assume, therefore, that the present amendments are the product of foresighted planning calculated to promote the welfare of the township. The Town has imposed temporary restrictions upon land use in residential areas while committing itself to a program of development. It has utilized its comprehensive plan to implement its timing controls and has coupled with these restrictions provisions for low and moderate income housing on a large scale. Considered as a whole, it represents both in its inception and implementation a reasonable attempt to provide for the sequential, orderly development of land in conjunction with the needs of the community, as well as individual parcels of land, while simultaneously obviating the blighted aftermath which the initial failure to. provide needed facilities so often brings.
The proposed amendments have the effect of restricting development for onwards to 18 years in certain areas. Whether the subject parcels will be so restricted for the full term is not clear, for it is equally probable that the proposed facilities will be brought into these areas well before that time. Assuming, however, that the restrictions will remain outstanding for the life of the program, they still fall short of a confiscation within the meaning of the Constitution.
An ordinance which seeks to permanently restrict the use of property so that it may not be used for any reasonable purpose must be recognized as a taking: The only difference between the restriction and an outright taking in such a case “ is that the restriction leaves the owner subject to the burden of payment of taxation, while outright confiscation would relieve him of that burden” (Arverne Bay Constr. Co. v. Thatcher, 278 N. Y. 222, 232, supra). An appreciably different situation obtains where the restriction constitutes a temporary restriction, promising that the property may be put to a profitable use within a reasonable time. The hardship of holding unproductive property for some time might be compensated for by the ultimate benefit inuring to the individual owner in the form of a substantial increase in valuation; or, for that matter, the *381 landowner, might be compelled to chafe under the temporary restriction, without the benefit of such compensation, when that burden serves to promote the public good (cf. Arverne Bay Constr. Co. v. Thatcher, 278 N. Y. 222, 232, supra).
We are reminded, however, that these restrictions threaten to burden individual parcels for as long as a full generation and that such a restriction cannot, in any context, be viewed as a temporary expedient. The Town, on the other hand, contends that the landowner is not deprived of either the best use of his land or of numerous other appropriate uses, still permitted within various residential districts, including the construction of a single-family residence, and consequently, it cannot be deemed confiscatory. Although no proof has been submitted on reduction of value, the landowners point to obvious disparity between the value of the property, if limited in use by the subject amendments and its value for residential development purposes, and argue that the diminution is so considerable that for all intents and purposes the land cannot presently or in the near future be put to profitable or beneficial use, without violation of the restrictions.
Every restriction on the use of property entails hardships for some individual owners. Those difficulties are invariably the product of police regulation and the pecuniary profits of the individual must in the long run be subordinated to the needs of the community. (Matter of Wulfsohn v. Burden, 241 N. Y. 288, supra; Shepard v. Village of Skaneateles, 300 N. Y. 115, supra; Arverne Bay Constr. Co. v. Thatcher, 278 N. Y. 222, supra; Ulmer Park Realty Co. v. City of New York, 270 App. Div. 1044, affd. 297 N. Y. 788.) The fact that the ordinance limits the use of, and may depreciate the value of the property will not render it unconstitutional, however, unless it can be shown that the measure is either unreasonable in terms of necessity or the diminution in value is such as to be tantamount to a confiscation (see, e.g., Vernon Park Realty v. City of Mount Vernon, 307 N. Y. 493, 499). Diminution, in turn, is a relative factor and though its magnitude is an indicia of a taking, it does not of itself establish a confiscation (Pennsylvania Coal Co. v. Mahon, 260 U. S. 393; Dowsey v. Village of Kensington, 257 N. Y. 221, supra; Arverne Bay Constr. Co. v. Thatcher, *382 278 N. Y. 222, supra; cf. Westwood Forest Estates v. Village of South Nyack, 23 N Y 2d 424, 427, supra).
Without a doubt restrictions upon the property in the present case are substantial in nature and duration. They are not, however, absolute. The amendments contemplate a definite term, as the development points are designed to operate for a maximum period of 18 years and during that period, the Town is committed to the construction and installation of capital improvements. The net result of the on-going development provision is that individual parcels may be committed to a residential development use prior to the expiration of the maximum period. Similarly, property owners under the terms of the amendments may elect to accelerate the date of development by installing, at their own expense, the necessary public services to bring the parcel within the required number of development points. While even the best of plans may not always be realized, in the absence of proof to the contrary, we must assume the Town will put its best effort forward in implementing the physical and fiscal timetable outlined under the plan. Should subsequent events prove this assumption unwarranted, or should the Town because of some unforeseen event fail in its primary obligation to these landowners, there will be ample opportunity to undo the restrictions upon default. For the present, at least, we are constrained to proceed upon the assumption that the program will be fully and timely implemented (n. 7, p. 373, supra).
Thus, unlike the situation presented in Arverne Bay Constr. Co. v. Thatcher (278 N. Y. 222, supra), the present amendments propose restrictions of a certain duration and founded upon estimate determined by fact. Prognostication on our part in upholding the ordinance proceeds upon the presently permissible inference that within a reasonable time the subject property will be put to the desired use at an appreciated value. In the interim assessed valuations for real estate tax purposes reflect the impact of the proposed restrictions (cf. Arverne Bay Constr. Co. v. Thatcher, 278 N. Y. 222, 232, supra). The proposed restraints, mitigated by the prospect of appreciated value and interim reductions in assessed value, and measured in terms of the nature and magnitude of the project undertaken, are within the limits of necessity.
*383 In sima, where it is clear that the existing physical and financial resources of the community are inadequate to furnish the essential services and facilities which a substantial increase in population requires, there is a rational basis for “phased growth ” and hence, the challenged ordinance is not violative of the Federal and State Constitutions. Accordingly, the order appealed from should be reversed and the actions remitted to Special Term for entry of a judgment declaring section 46-13.1 of the Town Ordinance constitutional.

. The Town’s allegations that present facilities are inadequate to service increasing demands goes uncontested. We must assume, therefore, that the proposed improvements, both as to their nature and extent, reflect legitimate community needs and are not veiled efforts at exclusion (see National Land & Inv. Co. v. Easttown Twp. Bd. of Adj., 419 Pa. 504). In the period 1940-1968 population in the unincorporated areas of the Town increased 285.9%. Between the years of 1950-1960 the increase, again in unincorporated areas, was 130.8%; from 1960—1966 some 78.5%; and from the years 1966-1969 20.4%. In terms of real numbers, population figures compare at 58,626 as of 1966, with the largest increment of growth since the decennial census occurring in the undeveloped areas. Projected figures, assuming current land use and zoning trends, approximate a total Town population of 120,000 by 1985. Growth is expected to be heaviest in the currently undeveloped western and northern tiers of the Town, predominantly in the form of subdivision development with some apartment construction. A growth rate of some 1,000 residential units per annum has been experienced in the unincorporated areas of the Town.

. As of July, 1966, the only available figures, six residential zoning districts with varying lot size and density requirements accounted for in excess of nine tenths of the Town’s unincorporated land area. Of these the RR classification (80,000 square feet minimum lot area) plus R-35 zone (35,000 square feet minimum lot area) comprise over one half of all zoned areas. The subject sites are presently zoned RR-50 (50,000 square feet minimum lot area). The reasonableness of these minimum lot requirements are not presently controverted, though we are referred to no compelling need in their behalf (see Salamar Bldrs. Corp. v. Tuttle, 29 N Y 2d 221; see, also, National Land & Inv. Co. v. Easttown Twp. Bd. of Adj., 419 Pa. 504, supra; Concord Twp. Appeal, 439 Pa. 466). Under present zoning regulations, the population of the unincorporated areas could be increased by about 14,600 families (3.5 people) when all suitable vacant land is occupied. Housing values as of 1960 in the unincorporated areas range from a modest $15,000 (approx. 30%) to higher than $25,000 (25%), with the undeveloped western tier of Town showing the highest percentage of values in excess of $25,000 (41%). Significantly, for the same year only about one half of one percent of all housing units were occupied by nonwhite families. Efforts at adjusting this disparity are reflected in the creation of a public housing authority and the authority’s proposal to construct biracial low-income family housing (see Fletcher V. Romney, 323 F. Supp. 189 [S.D.N.Y.] ; Matter of Greenwald v. Town of Ramapo, 35 A D 2d 958; Matter of Farrelly v. Town of Ramapo, 35 A D 2d 957).

. Of the activities referred to and expressly sanctioned by the enabling legislation (Town Law, § 261) there would appear to be a direct correlation between population density, the demand for municipal services ini the form of school, water, sanitary, police and fire protection facilities (Johnston, Land Use Control, Annual Survey of American Law [1969/70], p. 49). To the extent that the subject regulations seek to insure provision of adequate facilities, they too may be identified as forms of density controls.

. Early legislation, based on a Standard State Zoning Enabling Act, prepared by the Department of Commerce, contemplated a minimum of flexibility and its form was dictated by widely held constitutional concerns (see Bettman, Constitutionality of Zoning, 37 Harv. L. Rev. 834; A.L.I., A Model Land Development Code [Tent. Draft No. 1, 1968], Intro. Mem., p. xvii [hereinafter ALI, A Model Land Development Code]), not the least of which related to the scope of authorized objectives.

. This distinction, though often unartieulated, is elemental and we have in the past held the exercise of the zoning power ultra vires and void where the end sought to be accomplished was not peculiar to the locality’s basic land use scheme, but rather related to some general problem, incidental to the community at large (Westwood Forest Estates v. Village of South Nyack, 23 N Y 2d 424, 428, supra; Udell v. Haas, 21 N Y 2d 463, 471; De Sena v. Gulde, 24 A D 2d 165, supra; National Land & Inv. Co. v. Easttown Twp. Bd. of Adj., 419 Pa. 504, 526, supra; Delaware County Community Coll. Appeal, 435 Pa. 264, 270; Concord Twp. Appeal, 439 Pa. 466, 471-474, supra; see, also, Haar, “ In Accordance With a Comprehensive Plan ”, 68 Harv. L. Rev. 1154, 1173; 1 Rathkopf, Law of Zoning and Planning [1971 Cum. Supp.], p. 2-9).

. A scheme similar in its broad outlines has been proposed in the New York State Planning Law Revision Study, Study Doe. No. 4 (New York State Office of Planning Coordination, Feb., 1970), These proposals written into bill form, were introduced for study purposes at the 1970 Legislative Session as Senate Bill 9028. The delegation of power would authorize the control and regulation of land use and development for any constitutional purpose (Proposed Land Use and Development Planning Law, § 2-102, as proposed by Sen. No. 9028 of 1970 [hereinafter Proposed Land Use and Development Planning Law]). This broad base authorization purports to be a marked departure from current law which specifies the techniques available to local subdivisions and commits them to traditional approaches “unless they are willing to risk legal vulnerability with innovative, imaginative concepts ” (Report of New York State Planning Law Revision Study, Presented at the AIP Sixth Biennial Conference on Governmental Relations and Planning Policy, Washington, Jan. 28, 1971 [New York State Office of Planning Coordination], p. 5). The proposal deals with phased growth and allows deferred *372 development on the ground that basic services and improvements are inadequate and their reasonable cost cannot be presently absorbed. (Proposed Land Use and Development Planning Law, § 2-105.) A plan and capital program are prerequisites to a showing that reasonable efforts are being expended to bring in these improvements and thus that the program comports to a legitimate effort to meet the demands of growth and development (Proposed Land Use and Development Planning Law, § 2-105; see, also, § 2-117). As a concomitant to the timed restrictions, proposals extend the power of inverse condemnation to provide for compensation where the restrictions are so unreasonable as to constitute a taking (Proposed Land Use and Development Planning Law, § 2-108). Additional proposals call for an integrated State-wide planning process, with emphasis upon regional and State planning powers (Proposed Land Use and Development Planning Law, §§ 3-101, 3-115, 4-101; New York State Planning Law Revision Study, Study Doc. No. 4, [New York Office of Planning Coordination, Feb., 1970]). Similar proposals are incorporated in the first two drafts prepared by the American Law Institute in “ A Model Land Development Code ” (ALI, A Model Land Development Code [Tent. Draft Nos. 1, 2, 1968,1970]).

. The difference between the ordinary situation and the situation said to subsist here resides in the fact that where plat approval is denied for want of various improvements, the developer is free to provide those improvements at his own expense. In the ordinary case where the proposed improvements will not be completed before the plat is filed the developer’s obligation is secured by a performance bond (Town Law, § 277; see, also, Control of Land Subdivision, Office of Planning Coordination [1968 ed.], p. 32). On the other hand, in the present case, plat approval is conditioned upon the Town’s obligation to undertake improvements in roads, sewers and recreational facilities. As the Town may not be held to its program, practices do vary from year to year “ and fiscal needs cannot be frozen beyond review and recall ” (concurring opn. Hopkins, J., 37 A D 2d 244), the “patient owner” who relied on the capital program for qualification then is said to face the prospect that the improvements will be delayed and the impediments established by the ordinance further extended by the Town’s failure to adhere to its own schedule.
The reasoning, as far as it goes, cannot be challenged. Yet, in passing on the validity of the ordinance on its face, we must assume not only the Town’s good faith, but its assiduous adherence to the program’s scheduled implementation. We cannot, it is true, adjudicate in a vacuum and we would be remiss not to consider the substantial risk that the Town may eventually default in its obligations. Yet, those are future events, the staple of a clairvoyant, not of a court in its deliberations. The threat of default is not so imminent or likely that it would warrant our prognosticating and striking down these amendments as invalid on their face. When and if the danger should materialize, the aggrieved landowner can seek relief by way of an article 78 proceeding, declaring the ordinance unconstitutional as applied to his property. Alternatively, should it arise at some future point in time that the Town must fail in its enterprise, an action for a declaratory judgment will indeed prove the most effective vehicle for relieving property owners of what would constitute absolute prohibitions.

. Invariably, the primary responsibility for formulating and implementing zoning policy remains in the hands of local government, with provision for review at county, State and regional levels (see, e.g., Proposed Land Use and Development Planning Law, §§ 2-102, 4-101, 4-102; ALI, A Model Land Development Code, art. 7; New York State Planning Revision Study, Study Doc. No. 4 [State Office of Planning Coordination, Feb., 1970], pp. 23-52).