**Q.C. CONSTRUCTION COMPANY, INC., Nicholas Cambio and Frank Paolino**

v.

**Frank GALLO, in his capacity as Building Official of the Town of Johnston, Louis R. Maccarone, Joseph Falvo, Benjamin Zanni, Joseph Voccola and Michael R. Simone, in their capacity as Members of the Johnston Town Council, Albert Verrengia in his capacity as Johnston Director of Finance and Vincent Iannazzi, in his capacity as Chairman of the Johnston Sewer Commission.**

Civ. A. No. 85–224 L.

United States District Court,
D. Rhode Island.

Dec. 15, 1986.

Michael A. Kelly and Patricia K. Rocha, Providence, R.I., for plaintiffs.

William Corrente, Asst. Town Solicitor, Johnston, R.I., for defendants.

## OPINION

LAGUEUX, District Judge.

This case involves the constitutionality of a residential building moratorium enacted by Resolution of the Johnston Rhode Island Town Council on July 11, 1983. Plaintiffs have brought this action under 42 U.S.C. § 1983, alleging that, as a result of the moratorium, defendants have deprived plaintiffs of their property without due process of law in violation of the Fifth and

Fourteenth Amendments to the United States Constitution. Thus, the Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331.

Plaintiffs in this action are Nicholas Cambio, Frank Paolino, and the Q.C. Construction Company, Inc. Cambio and Paolino are joint owners of the Q.C. Construction Company. Plaintiffs are engaged in the business of residential real estate development and construction. In conducting their business, plaintiffs purchase undeveloped land and, after acquiring the necessary permits, they build homes on the land and sell these homes to the public. Cambio acted as the sole spokesman for plaintiffs throughout the time period in issue in this case. Cambio testified that he has been a real estate developer for about twenty years. During that time, he has developed thirty subdivisions involving the construction of several hundred homes.

In 1983, prior to the enactment of the Resolution, plaintiffs purchased, for the purpose of residential development, over thirty lots of land in the Lakewood Terrace area of Johnston. The Lakewood Terrace area is a residential area containing single-family houses in the vicinity of the subject lots. After the purchase, Cambio obtained building permits for twelve of the lots after filing the necessary plot plans and other documents required by the Johnston Building Code. Included among the thirty or more lots originally purchased are fifteen lots located on Salina Avenue, Lakewood Drive, Barbato Drive, and Mulberry Circle in Johnston. As a result of the Town Council's moratorium, plaintiffs have been unable to obtain building permits for the remaining fifteen buildable lots (the Lots). The twelve lots for which Cambio obtained building permits are in close proximity (with some abutting) to these fifteen Lots.

All defendants in this action are officials of the Town of Johnston. Frank Gallo is employed by the Town as the head of the Department of Building Inspection. His title is Building Inspector. Gallo has the authority to enforce the zoning and building ordinances of Johnston and issue build-ing permits for land located in the Town. Gallo is also a member of the Johnston Sewer Commission. In February, 1984, Gallo, relying on the Resolution, refused to issue building permits to plaintiffs for the Lots in question. Vincent Iannazzi is Chairman of the Johnston Sewer Commission which maintains the sewer system (such as it is) in the Town. That Commission has the authority to issue sewer connection permits authorizing tie-in to the sewer lines in existence in the Town. In February, 1985, Iannazzi, also relying on the Resolution, refused to issue sewer connection permits to plaintiffs for the Lots in question. Louis R. Maccarone, Joseph Falvo, Benjamin Zanni, Joseph Voccola and Michael R. Simone were the members of the Johnston Town Council when the Resolution was enacted in July 1983. Albert Verrengia was then and is now the Director of Finance of the Town of Johnston.

It became evident during the trial of this case that the Town of Johnston has never adequately planned for the installation and maintenance of its sewer lines. It never had a comprehensive plan for expanding or adapting its sewer facilities to meet the needs of growth. For example, the Town has never issued bonds in order to finance an orderly expansion of sewer facilities and it has never imposed fees on residents to finance improvements. In addition, the Town has failed to adequately supervise what little expansion has taken place.

Rather, the expansion of the sewer system to meet the Town's growing needs has occurred piece-meal. Johnston's sewer program in sum total, has been to require real estate developers as a condition to securing approval of residential development plans, to install sewer lines or repair parts of the existing system. Therefore, different developers have worked on the sewer lines at various times, but always as an adjunct to their development plans.

Installation of the sewer lines in issue here, particularly the line on Salina Avenue, was begun by a contractor who went bankrupt, and the work was finished under the auspices of a bonding company. From

the beginning, there were problems with these particular lines. Ground water, silt and sand infiltrated the lines, leading to sewer backup to the houses connected to the lines.

It is clear from the evidence introduced at trial that, at least at certain times, these backup problems persist in the area where the subject Lots are located. The minutes of the May 23, 1983 meeting of the Johnston Sewer Commission indicate that:

"Councilman Michael Simone, representing the Fifth District, addressed the Commission and explained the problems that people in this area are having with sewer backup.... The Commission explained that we have repaired a broken pipe in the line on Salina Street and that the line was inspected and declared to be in working order. However, due to the heavy rains we have been having in the past month, surface water may be getting into the line, causing an overflow."

The minutes of the November 19, 1984 meeting of the Commission include a report from Leonard Pezza, a part-time sewer inspector. Pezza had investigated sewer flow on Salina Avenue and had found that a problem existed. It also appears, from the Agreed Statement of Facts, that the Salina sewer line was monitored from time to time for recurring problems.

During trial, Pezza testified that before June of 1983, flow in that line was restricted because of obstructions. Pezza also testified, however, that the line appeared to be working properly by January 21, 1985, and that he had not been asked to inspect the line since. According to the testimony of Iannazzi, only an occasional cleaning out of the line has occurred since January, 1985. Iannazzi pointed out that this procedure is performed both regularly and in response to complaints. In any event, it is clear that sand, ground water and silt continue to enter and obstruct the sewer line from time to time.

A series of photographs admitted in evidence taken on March 12, 1983, shows water overflowing the sewer lines on Salina Avenue with flooding of the street and surrounding lands. One resident of Salina Avenue, Germaine Lopez, testified that her family could not use their bathroom when the sewer backed up. She testified that this had occurred a dozen times or more during 1983–84, but not since 1985.

Faced with these sewer problems, and apparently concerned with the effect of connecting new homes to the sewer lines in the area, the Johnston Town Council enacted the following Resolution on July 11, 1983:

"Motion ... to Send a Letter to the Building Inspector stating that no building permits are to be issued to the area of Belvidere St., Truman St., Barbado Dr., Salina Ave., and Mulberry Circle until the sewer problems in this area are rectified due to the health, safety and welfare of the residents in that area."

Before this Resolution was enacted, Cambio had obtained building permits for only twelve of his lots. As the town officials had required of other developers in the past, Cambio was required to perform repairs on the sewer system in that area in order to obtain building permits for his remaining Lots. Cambio had a conversation with Gallo in which Cambio was asked to repair the sewer system on Salina Avenue and to work on a small section of drainage on that street. Gallo told Cambio that he would issue the remaining twelve or thirteen building permits necessary for the fifteen Lots upon completion of that repair and drainage work.

Cambio spent in excess of twenty thousand dollars performing work on the sewer line. He posted bonds with the Town to insure completion of that work. He completed the repair work in a manner satisfactory to the Town. Thus, plaintiffs had every expectation that, upon successful completion of the repairs, they would receive the remaining building permits for the subject Lots.

On August 19, 1984, after completing the required work, Cambio applied to the Building Inspector for the building permits. Gallo finally responded on February 8,

1985, denying Cambio's application stating that:

> "... based on the resolution of the Johnston Town Council [of] July 11, 1983, I cannot approve any construction permits in the above area without approved septic systems."

Cambio had first learned of the Town Council Resolution when he applied to Gallo for the permits. He had no prior notice of the impending Resolution and moratorium.

In January 1985, plaintiffs learned of Pezza's report to the Sewer Commission that the Salina line was working properly. Therefore, they applied for permits authorizing connection of the Lots to the line. Iannazzi denied that application, writing that:

> "At the meeting of the Johnston Sewer Commission, held on February 19, 1985, a Motion was made and seconded to abide by the resolution of the Johnston Town Council dated July 11, 1983, restricting building permit because of a sewer problem. This office will not issue any sewer tie-in permit except in an emergency situation for existing homes, in this area until the problem is resolved."

Iannazzi testified at trial that the Sewer Commission still abides by the Town Council's Resolution of July 11, 1983, although two existing homes were allowed to tie-in recently.

Consequently, the Resolution, as interpreted by Gallo and Iannazzi, effectively creates a moratorium on all new construction and sewer connections in the area of the subject Lots. Clearly plaintiffs have been unable to obtain building permits and sewer connection permits for their Lots because of the Resolution. Gallo stated unequivocally Cambio would have received building permits for the Lots in August or September 1984 if the Town Council had not passed the Resolution.

Plaintiffs demonstrated during the trial that the Lots are unsuitable for any other kind of sewage disposal system. John Caito, an expert on water table levels and soil percolation testified that the significantly high water table and the percolation rate of the soil in the area of the Lots makes them unsuitable for an Individual Sanitary Disposal System (ISDS). He also pointed out that these conditions make it highly unlikely that the State Department of Health would approve an ISDS for any of the Lots. Since an ISDS is the only alternative to a connection to the Johnston sewer system, the moratorium on building permits effectively makes it impossible for plaintiffs to develop their land.

The Lots have decreased enormously in value as a result of plaintiffs' inability to develop their land. Plaintiffs introduced the testimony of Joseph W. Accetta, a real estate appraiser, who testified that if building permits were available for all of the Lots their total market value as of September 1986 would be $174,751. He also testified that the market value of the Lots, as of the same date, without the availability of building permits would be $17,474. The moratorium on building permits, thus, has resulted in a loss of market value of about 90% for plaintiffs. Accetta also opined that the best use of the Lots was for single-family home construction and without building permits, the Lots would have value only as undeveloped passive land for abutting landowners.

Since the date of the moratorium, Cambio has attempted to sell the Lots. To date, he has been unable to do so. Without building and sewer connection permits, plaintiffs have been denied all beneficial use of their property.

Plaintiffs filed suit in this Court on April 22, 1985, seeking declaratory and injunctive relief resulting from the refusal of Town officials to issue building and sewer connection permits. The parties submitted an Agreed Statement of Facts and the remaining disputed factual issues were tried before this Court in a non-jury trial.

In support of their contention that the moratorium Resolution is unconstitutional, plaintiffs essentially make three arguments: (1) they were denied procedural due

process of law in violation of the Fourteenth Amendment because they had no notice and no opportunity to be heard before the Resolution was adopted; (2) they have been denied substantive due process under the Fourteenth Amendment, i.e., the moratorium results in a deprivation of property rights without due process of law; and, (3) the moratorium results in a taking of property without just compensation contrary to the Fifth Amendment.

■ The first contention of the plaintiffs is clearly without merit. The procedural due process requirement of notice and hearing is not applicable to a legislative body in the performance of its legislative functions. *North Laramie Land Co. v. Hoffman*, 268 U.S. 276, 45 S.Ct. 491, 69 L.Ed. 953 (1925); *Golden Gate Corporation v. Sullivan*, 112 R.I. 641, 314 A.2d 152 (1974).

■ Some courts have adopted the view that excessive regulation by governmental authority results in a condemnation. This is sometimes referred to as "inverse condemnation" or "condemnation by regulation". *See, Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). The remedy fashioned in such circumstances is that the governmental authority is made to pay the owner the fair market value of the premises inversely condemned and thus it acquires the property. *See, e.g., Annicelli v. Town of South Kingstown*, 463 A.2d 133, (R.I.1983). Such a result should not be reached except in rare circumstances because it is contrary to the reasonable expectations of both parties. The governmental authority has no intention of condemning the premises involved but merely intends to regulate use, and the property owner wants to use the premises and not have the premises taken by eminent domain. Therefore, the better view is that when there is a loss of beneficial use of property by excessive regulation, the offending regulation should be declared invalid and of no effect. *State v. Johnson*, 265 A.2d 711, (Me.1970); *Bartlett v. Zoning Commission of the Town of Old Lyme*, 161 Conn. 24, 282 A.2d 907 (1971);

*Dooley v. Town Plan and Zoning Commission of the Town of Fairfield*, 151 Conn. 304, 197 A.2d 770 (1964); *Morris County Land Improvement Co. v. Township of Parsippany-Troy Hills*, 40 N.J. 539, 193 A.2d 232 (1963). This is that kind of a case. The moratorium Resolution enacted by the Johnston Town Council is unconstitutional and thus invalid because it results in the taking of plaintiffs' property without due process of law. The reasons for this conclusion follow.

The stated purpose of the July 11, 1983 Johnston Town Council Resolution was to protect the "health, safety and welfare of the residents in that area." The evidence clearly demonstrates that there were substantial problems in the sewer line on Salina Avenue. Those problems included flooding, sand and silt infiltration into the line, and blockage which resulted in sewer backup to homes connected to the line. Certainly a sewer line in such poor condition poses a threat to the welfare of residents in the area. Area residents complained about these conditions to Town officials from time to time. With this history of sewer problems and citizen complaints, fueled by the fear that new home construction and new sewer connections would exacerbate the situation, the Town Council enacted its moratorium on the issuance of building permits in this area. This moratorium then can be characterized as an exercise of the Town's police power in an attempt to protect the safety and welfare of its residents.

The decision of the United States Supreme Court in *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); provides a framework for evaluating the constitutionality of such an exercise of the police power. In *Goldblatt*, the Court upheld the constitutionality of a town ordinance, enacted as a safety measure, which prohibited any excavating below the water table and imposed an affirmative duty to refill any excavation below that level at the time the ordinance was enacted. 369 U.S. at 598, 82 S.Ct. at 992. The Court listed several factors to consider

in evaluating the validity and reasonableness of an exercise of the police power in general, and of a safety measure in particular.

These factors are " 'first, that the interests of the public ... require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.' " *Id.* at 594–95, 82 S.Ct. at 990 (quoting *Lawton v. Steele,* 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385 (1894). *See also, Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 127, 98 S.Ct. 2646, 2660, 57 L.Ed.2d 631 (1978) ("... a use restriction on real property may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial public purpose...."). Applying these general factors to the evaluation of a safety measure, the Court stated that it was necessary to know "the nature of the menace against which it will protect, the availability and effectiveness of other less drastic protective steps, and the loss which appellants will suffer from the imposition of the ordinance." *Goldblatt,* 369 U.S. at 595, 82 S.Ct. at 990. The Resolution of the Johnston Town Council must be declared unconstitutional in the light of these factors.

The first factor to be analyzed is the nature of the menace against which the resolution protects. As stated earlier, the poor condition of the sewer line poses a threat to the welfare of town residents in the affected area. While this threat demands some action by the Town, the Resolution is not a constitutionally appropriate action for the reasons discussed below.

The second factor requires analysis of whether the means are reasonably necessary for the accomplishment of the purpose, or whether less drastic alternatives are available. Analyzing the necessity of the Resolution and considering less drastic alternatives lead inescapably to the conclusion that the Resolution is unconstitutional. A moratorium on issuance of building and sewer connection permits is not reasonably necessary to protect the welfare of town residents. The moratorium only preserves the already bad situation that existed on July 11, 1983. The evidence establishes that sewer backups and flooding occurred a dozen times or more during 1983 and 1984. A moratorium, without further corrective action, does nothing to improve the sewer system. At best the moratorium only prevents a hypothetical deterioration in the situation attributable to new construction. The Town Council must have assumed that new construction and new sewer connections, would make matters worse. But absolutely no evidence was offered at trial that showed that additional residential connections would, in fact, worsen the condition of the Salina Avenue sewer line. In fact, two connections were made after the moratorium without adverse effects.

Alternatives less drastic than a moratorium would be far more effective in protecting the welfare of town residents. The Town, could, for example, take responsibility for a major overhaul or replacement of the existing system. Rather than have developers work on the sewer line piecemeal, the Town could finance a major overhaul through a bond issue, an assessment, or through developer contributions. At the very least, the Town could commission a study of its sewer system and receive recommendations on how to alleviate the problems. It did this in 1978 and nothing ever came of it. All of these possibilities are far less drastic than a moratorium on building and sewer connections. All of them could help improve, rather than merely preserve, the existing sewer system.

▮ The final *Goldblatt* factor requires examination of the loss plaintiffs will suffer and whether the Resolution is unduly oppressive. To establish an unconstitutional deprivation of property without due process of law, it is insufficient for plaintiff to show only that the regulation deprives him of the best use of his property or that the regulation has caused a severe decrease in the value of the property. *Goldblatt,* 369 U.S. at 592, 594, 82 S.Ct. at 988, 990; *Kent Island Joint Venture v. Smith,* 452 F.Supp. 455, 460 (D.Md.1978). Rather,

plaintiff must show that the regulation interferes so severely with his use of the property as to render the property worthless or useless. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 414–15, 43 S.Ct. 158, 159–60, 67 L.Ed. 322 (1922); *Donohoe Construction Co., Inc. v. Montgomery County Council,* 567 F.2d 603, 608 & n. 13 (4th Cir.1977), *cert denied,* 438 U.S. 905, 98 S.Ct. 3123, 57 L.Ed.2d 1148 (1978); *Steel Hill Development, Inc. v. Town of Sanbornton,* 469 F.2d 956, 963 (1st Cir.1972); *Smoke Rise, Inc. v. Washington Suburban Sanitary Commission,* 400 F.Supp. 1369, 1383 (D.Md.1975). The Supreme Court has also considered the extent to which a regulation interferes with the owner's distinct, investment-backed expectations. *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City,* 473 U.S. 172, 105 S.Ct. 3108, 3119, 87 L.Ed.2d 126 (1985); *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659.

Applying these factors to the present case, the degree of interference to the plaintiffs' property rights posed by the Town Resolution is so substantial as to render the Resolution unconstitutional. The evidence established that the inability of plaintiffs to obtain building permits caused a reduction of roughly 90% in the market value of the property. Although a 90% decline in value, by itself, might not be sufficient to justify finding the Resolution unconstitutional, in the present case the injury is greater than that. First, the Resolution is a huge interference with the plaintiffs' distinct, investment-backed expectations. Plaintiffs, real estate developers, purchased the Lots intending to build homes on them for resale. This Resolution, denying them building and sewer connection permits, completely frustrates their legitimate investment expectations.

Second, the Resolution effectively renders the plaintiffs' property worthless or useless. Without building permits, the Lots have value only as passive land for abutting landowners. If the only remaining use for one's land is to provide an empty lot for the benefit of one's neighbors, then the property has become truly worthless and useless to the owner.

Several cases have upheld the constitutionality of moratoriums on building or sewer connection permits. *See, e.g., Schafer v. New Orleans,* 743 F.2d 1086 (5th Cir.1984); *Smoke Rise,* 400 F.Supp. at 1385; *Golden v. Planning Board of the Town of Ramapo,* 30 N.Y.2d 359, 285 N.E.2d 291, 334 N.Y.S.2d 138 (1972) *appeal dismissed, Rockland County Builders Assoc. v. McAlevey,* 409 U.S. 1003, 93 S.Ct. 440, 34 L.Ed.2d 294 (1972). But the constitutionally approved moratoriums have been very different from the moratorium at issue here. Moratoriums have been approved when they form a part of a comprehensive plan to remedy a problem situation. *Schafer,* 743 F.2d at 1090; *Smoke Rise,* 400 F.Supp. at 1394; *Golden,* 30 N.Y.2d at 380, 285 N.E.2d at 303, 334 N.Y.S.2d at 153; *See also, Westwood Forest Estates, Inc. v. Village of So. Nyack,* 23 N.Y.2d 424 at 428, 244 N.E.2d 700 at 702, 277 N.Y.S.2d 129 at 133 (zoning amendment barring new construction of multiple dwellings improper because it was not adopted in furtherance of a comprehensive plan). Approved moratoriums have also been either temporary or of reasonable or limited duration. *See, Schafer,* 743 F.2d at 1090 (resolution creating temporary moratorium on construction, pending a study of land use in the area, is constitutional); *Smoke Rise,* 400 F.Supp. at 1385–86 (moratorium must be reasonably limited as to time; five-year moratorium is reasonable in view of complex multi-jurisdictional sewer problems); *See also, Charles v. Diamond,* 41 N.Y.2d 318, 324, 360 N.E.2d 1295, 1300, 392 N.Y.S.2d 594, 599 (1977). ("Temporary restraints necessary to promote the overall public interest are permissible. Permanent interference with the reasonable use of private property for the purposes for which it is suited is not.")

Some courts have reasoned that a local government must act reasonably and in good faith to remedy problems that have been handled, in the short run, through restrictions on developers. In *Wincamp*

*Partnership, OTC v. Anne Arundel County, Maryland,* 458 F.Supp. 1009, 1030 (D.Md.1978), the Court held among other things, that the county's delay in expanding its sewage treatment capacity, resulting in the inability of plaintiff developers to obtain building permits for their land, was not a violation of plaintiffs' substantive due process rights. The Court found that the county was about to expand its facilities, so that the moratorium could be considered limited in time, and that the county had developed a plan. *Id.* at 1029. Describing the situation in which the Court would provide relief for the plaintiffs, the Court stated that:

> "[i]f the County fails to carry through in good faith and with reasonable speed and efficiency its announced purpose to provide increased capacity ... if the County indefinitely postpones that expansion with no interim or long-term blueprint to solve plaintiffs' dilemma as developers, plaintiffs will of course be free to commence a new action to enforce their federal constitutional rights." *Id.* at 1030.

*See, Charles v. Diamond,* 41 N.Y.2d at 327, 360 N.E.2d at 1301, 392 N.Y.S.2d at 600. ("Crucial also is the diligence and good faith of municipal officials in pursuing the necessary improvements.") *Belle Harbor Realty Corp. v. Kerr,* 35 N.Y.2d 507, 512, 323 N.E.2d 697, 699, 364 N.Y.S.2d 160, 163 (1974) ("To justify interference with the beneficial enjoyment of property the municipality must establish that it has acted in response to a dire necessity that its action is reasonably calculated to alleviate or prevent the crisis condition, and that it is presently taking steps to rectify the problem.")

This is just such a case demanding that this Court enforce plaintiffs' constitutional rights. Unlike the constitutionally approved moratoriums, the Resolution of the Johnston Town Council is not part of a plan to remedy the problems in the Town sewer system. The Resolution was enacted as a stop-gap, emergency measure, not pursuant to any plan. Furthermore, there was no evidence introduced at trial to show that the Town has taken remedial action of any kind since the enactment of the Resolution.

In addition, the Resolution is not temporary or time limited in its effect. The Resolution is still in force, over three years since its enactment in July, 1983. In the absence of any action by the Town to improve its sewer system, the moratorium could last indefinitely.

Considering Johnston's long history of inaction and inadequate planning with regard to its sewer system, this is clearly not a case in which the Town has acted reasonably and in good faith to alleviate its infrastructure problems.

For all of the reasons discussed above, this Court concludes that the Resolution as enacted and as applied by the Johnston Town officials results in a deprivation of plaintiffs' property rights without due process of law.

## REMEDY

When a regulation of property use is so oppressive or arbitrary as to be unconstitutional, as this Court finds the Resolution of the Johnston Town Council to be, one proper remedy is a declaration of the invalidity of the purported exercise of the police power. *Pamel Corp. v. Puerto Rico Highway Auth.,* 621 F.2d 33, 35 (1st Cir.1980); *Jensen v. City of New York,* 42 N.Y.2d 1079, 1081, 369 N.E.2d 1179, 1180, 399 N.Y.S.2d 645, 646 (1977); *See also, Charles v. Diamond,* 41 N.Y.2d at 329, 360 N.E.2d at 1303, 392 N.Y.S.2d at 603. Therefore, this Court declares, that the moratorium Resolution enacted by the Johnston Town Council on July 11, 1983 is unconstitutional because it deprives plaintiffs of their property without due process of law in contravention of the Fourteenth Amendment to the United States Constitution.

 Injunctive relief is also an appropriate remedy for a constitutionally defec-

tive police power regulation. *Urbanizadora Vessalles, Inc. v. Rivera Rios*, 701 F.2d 993, 996 (1st Cir.1983); *Citadel Corp. v. Puerto Rico Highway Auth.*, 695 F.2d 31, 34 (1st Cir.1982) *cert denied*, 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983). Plaintiffs have asserted that a proper remedy in this case would be for the Court to issue a mandatory injunction ordering the Johnston Building Inspector and the Johnston Sewer Commission to issue building and sewer connection permits, respectively, to plaintiffs. The Court is presently unable to grant such mandatory relief because plaintiffs did not produce at trial the plot plans and other information required under the Building Code in order to obtain building permits.

Clearly, however, the Town Council Resolution cannot act as a bar to consideration of plaintiffs' future application for building permits on the merits. Defendants in this case can no longer rely on the Resolution as a basis for denying the permits. This Court, therefore, orders the Johnston Building Inspector to consider any new application by plaintiffs for building permits with a view to determining whether it complies with the Johnston Building Code and without regard to the Resolution. *See, Curtis Martin Investment Trust v. Clay*, 274 S.C. 608, 266 S.E.2d 82 (1980) (remedy for unconstitutional denial of sewer connection permit is to order the appropriate District authority to act upon the merits of the application); *Cf. Belle Harbor Realty Corp. v. Kerr*, 35 N.Y.2d 507, 512, 323 N.E.2d 697, 699, 364 N.Y.S.2d 160, 163 (1974). (reversed decision of Appellate Division ordering city to issue approvals and permits, and instead allowed a hearing to determine whether revocation of building approvals was justified to prevent dangerous condition or was merely pretextual).

The testimony of Gallo that plaintiffs would have received building permits were it not for The Resolution is crucial here. It is clear then, that without the intervening moratorium, the permits would have been issued to plaintiffs in August or September 1984. Equity regards as done what should have been done. Therefore, if plaintiffs make new application for thirteen building permits with accompanying plot plans and other documents that establish compliance with the Johnston Building Code, this Court mandates that the Building Inspector of Johnston issue such permits. In addition, if and when plaintiffs receive such permits, the Court also mandates that the Chairman of the Johnston Sewer Commission issue the necessary permits to allow plaintiffs to connect into the sewer lines in the Salina Avenue area. Only in this way can plaintiffs be put in the same situation that they would have been in had the Resolution not been adopted. This is the order of the Court despite any attempts by the recently established Narragansett Bay Commission to assert jurisdiction over residential connections to the Johnston sewer system.

Plaintiffs also are entitled to costs and an award of counsel fees under 42 U.S.C. § 1988. Any motion for such costs including counsel fees shall be made within twenty (20) days of this decision. The application for counsel fees must be supported by a detailed, contemporaneous accounting of the time spent by the attorneys on this case. *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 952 (1st Cir.1984).

Counsel for plaintiffs shall draft and submit to the Court, a proposed form of judgment.

IT IS SO ORDERED.