OPINION OF THE COURT
Edward J. Greenfield, J.
Every dog has its day. However, when the rights of dogs come into conflict with the rights of man, issues are posed which polarize society, engage the noblest and the basest passions of mankind, and set brother against brother. As this court has had occasion to observe upon a previous occasion in Rubenstein v Mayhew (NYLJ, Nov. 23, 1971, p 2, cols 2-3): "All mankind is divided into three parts. The larger proportion love dogs passionately, harbor them, fawn upon them, share their lives and troubles and joys with them, and defend with vehemence any attack or infringement of canine rights. The devotion of man to dog and vice versa is a matter of song, legend and of folk wisdom. 'Love me, love my dog’ is an expression which requires third persons to take or reject master and pet as a unit. (Despite this apparent deep attachment to dogs among most humans, the attribution of canine parentage to a fellow human is a standard and sometimes deliberately provocative epithet, although the impact has become dulled with usage). A smaller proportion of mankind hates dogs passionately and expresses detestation for their barking and leaping and slavish affection, and for their generous leavings in public places. Landlords and neighbors frequently fall into this category. Then there is that tiny fragment of the population which apparently does not care one way or another about dogs, and devotes its attention to problems of lesser impact like nuclear destruction, economic disaster, over-population, and the pernicious influence of pornography.”
This case is one which has generated the passions of all such groups, and as to which very few can be counted among the indifferent. With an estimated 600,000 dogs in the City of New York making their daily contribution, it is doubtful whether anyone these days could "trip the light fantastic” on the sidewalks of New York, or in the streets and gutters *1077 either. Exasperation and concern on the part of some of the population led public spirited legislators hailing from sidewalks of New York such as Senator Franz Leichter and Assemblyman Edward H. Lehner, as well as Senators Griffin and Tauriello from Buffalo, to introduce a bill in the Legislature to require all city dog owners to pick up after their pets in public places. The law, which was enacted by the Legislature and signed by the Governor (L 1977, ch 464, § 1), became section 1310 of the Public Health Law, effective August 1, 1978, and has become popularly known as the "Pooper Scooper Law”.
The constitutionality of that law is under challenge in this lawsuit, which is brought by the president of the Pet Owners Protective Association, and by individual dog owners, who contend:
(1) the law is violative of due process and is not a proper exercise of the police power;
(2) denies plaintiffs equal protection of the laws;
(3) violates the principles of municipal home rule;
(4) it is unreasonable, arbitrary and capricious;
(5) creates hardship and injustice to plaintiffs;
(6) interferes with plaintiffs’ rights to own property;
(7) is impossible of compliance and enforcement;
(8) is vague and ambiguous;
(9) would tend to cause a breach of peace; and,
(10) violates the constitutional guarantees of freedom of religion.
Plaintiffs’ suit asks that the law be declared unconstitutional, and that the defendants — the State Attorney-General, the New York City Police Commissioner, the Sanitation Commissioner and the Commissioner of Air Resources be enjoined from enforcing it. The Attorney-General has cross-moved, on behalf of all defendants, for dismissal of the complaint. The court will treat that application as a motion for summary judgment.
The statute in question is quite simple. It consists of three sentences, and reads as follows (Public Health Law, § 1310):
"Removal of canine wastes in cities with a population of four hundred thousand or more persons
"Notwithstanding any contrary provision of law, rule or *1078 regulation, in cities with a population of four hundred thousand or more persons, it shall be the duty of each dog owner to remove any feces left by his dog on any sidewalk, gutter, street or other public area. Any violation of this section shall constitute a violation punishable by a fine or a civil penalty of not more than one hundred dollars. For the purposes of enforcing the provisions of this section, appearance tickets may be issued by sanitation officers and by any persons authorized to issue tickets for parking violations.”
The plaintiffs claim that the law places such onerous burdens on dog ownership as to make it virtually impossible for city dwellers to continue to own dogs, and that the statute is so vague and ambiguous as to be unenforceable.
We start out, of course, with a strong presumption of constitutionality. (Lehnhausen v Lake Shore Auto Parts Co., 410 US 356; Matter of Malpica-Orsini, 36 NY2d 568.) The Legislature has chosen to exercise the police power of the State to attempt to abate what it deems to be a public nuisance, and a health hazard as well as an aesthetic eyesore. It is for the Legislature to decide on the wisdom and necessity for a particular law, and if justified by any state of facts, and otherwise meets constitutional standards, the court’s inquiry ends. (Matter of Spielvogel v Ford, 1 NY2d 558, 562, app dsmd 352 US 957; I. L. F. Y. Co. v Temporary State Housing Rent Comm., 10 NY2d 263, 269, app dsmd 369 US 795; Matter of Van Berkel v Power, 16 NY2d 37, 40.)
It is elementary that a statute designed to foster the safety, health, and welfare of the people of the State is a reasonable and proper exercise of the police power. (People v Stover, 12 NY2d 462, app dsmd 375 US 42.) As stated by Mr. Justice Douglas for a unanimous court in Berman v Parker (348 US 26, 33): "The concept of the public welfare is broad and inclusive. * * * The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean * * * If those who govern * * * decide that [a city] should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way.”
We all recognize that the city is different from the country, and that the intense concentration of population in the city makes it necessary to prohibit, limit, or regulate certain *1079 practices which could be tolerated in the countryside. Thus, the police power has been held to be properly exercised in prohibiting the raising of pigs (Servodidio v Board of Appeals of Town of Somers, 146 NYS2d 125) or the keeping of bees (Olmstead v Rich, 53 Hun 638, opn in 6 NYS 826) or the breeding of pigeons (People v Benincasa, 63 Misc 2d 648) in populated areas.
Dogs have always occupied a special niche in the animal world. A best friend to man, a guardian, a companion in loneliness, a playmate for children — even urban dwellers may make a place for them in their more crowded city quarters. But the delight they bring to some creates problems for others, and a balance must be struck. Hence, even as to dogs, reasonable rules may be enforced to deal with the health and safety problems which arise from their ownership. (Bogan v New London Housing Auth., 366 F Supp 861; East Riv. Housing Corp. v Matonis, 34 AD2d 937.) "All of us who own and love dogs must realize that the possession of dogs in the city is subject to the limitation that such possession must not interfere with the security, health and comfort of the other inhabitants of the city, and the ordinances made by the proper municipal authorities for the protection of health or comfort must be accepted as limitations upon the privilege of such possession.” (People ex rel. Knoblauch v Warden, 89 Misc 243, 247 [Lehman, J.], affd 168 App Div 951, affd 216 NY 154.)
Accordingly, statutes and ordinances have been upheld which call for the registration and licensing of dogs, compulsory vaccination, sterilization, the requirement of leashes and muzzles, limitation as to the number kept, the roundup and impounding of stray dogs, their destruction if unclaimed, and even their turnover to laboratories for experimentation and authorization to shoot any loose dog on sight if a night quarantine has been imposed. (62 CJS, Municipal Corporations, § 218, pp 402-403 [dogs].) For illustrative cases, see Dog Owners Assn. of N. Y. State v Hilleboe (206 Misc 119, affd 307 NY 734), Blair v Du Mond (200 Misc 1036, app dsmd 304 NY 607), New York Voters League Against Vivisection v Hilleboe (202 Misc 687, app dsmd 282 App Div 671), Central Westchester Humane Soc. v Hilleboe (202 Misc 881), Murphy v Hitchcock (150 Misc 36), and Matter of Chernik v Department of Health of City of N. Y. (69 Misc 2d 710). For regulatory statutes see sections 106 to 126 of the Agriculture and Markets Law, former section 505 of the Public Health Law, ECL *1080 11-0923, section 88 of the General Municipal Law and section 3.03 et seq. of the New York City Health Code.
Dogs, then, by reason of their nonhuman condition, are not exempt from the plethora of detailed regulations which afflict mankind as fleas afflict beagles. "If the life of his master can be regulated in so many diverse ways, a dog could hardly be expected to escape restrictions upon his own activities.” (Blair v Du Mond, 200 Misc, supra, at p 1038.)
In the light of the numerous regulations and restrictions on a dog’s life which have already been sustained, a further limitation, such as the "Pooper Scooper Law”, does not appear to strain the bounds of constitutionality. The principle of requiring picking up after one’s dog passed constitutional muster in our sister State of New Jersey several years ago (Town of Nutley v Forney, 116 NJ Super 567) on the grounds that excrement and unpolluted environment are mutually exclusive, and that there was ample basis for a legislative conclusion that public health, safety and welfare were threatened. Given the pickup requirement however, the court concluded that the curbing of one’s dog need no longer be compelled.
It is clear that the police power of the State may properly be invoked to require a more sanitary disposition of dog droppings on the streets and sidewalks of our major cities than the method heretofore in vogue — of leaving it for the attention of other curious dogs, for the flies and the weather, or for the inadvertent missteps of the inattentive passerby. Not only is laissez faire in these circumstances unsightly and repulsive, but the possibility of bacterial and larval infections being spread is ever present, not only to humans, but even more to other dogs. Three hundred and fifty thousand pounds of dog waste left daily on the sidewalks of New York cannot and need not be ignored, and the Legislature may properly put the burden on each individual dog owner to assure that his satisfaction with his pet is not the bane of his neighbors’ existence.
Even if the statute were grounded solely on sanitation and aesthetics it would be upheld, for a statute which proscribes conduct which is unnecessarily offensive to the visual sensibilities of the average person, or to the senses of hearing and smell would be considered a valid subject of regulation under the police power. (People v Stover, 12 NY2d 462, 468; People v *1081 Rubenfeld, 254 NY 245; see, also, Suffolk Outdoor Adv. Co. v Hulse, 56 AD2d 365; Friedland v Diamond, 67 Misc 2d 642.)
The fact that the law applies only to cities with a population in excess of 400,000 (i.e., New York and Buffalo) hardly constitutes a denial of the equal protection of the laws to the residents of those cities. Density of population creates distinct and unique problems, and a classification of cities to which a law will be applicable will be upheld if there is a reasonable basis for such classification. Certainly, a problem which is not even noticeable when there is one dog per square mile is accentuated, and calls for action when the canine population approaches 2,000 per square mile. Whenever density of population creates special metropolitan needs relating directly or even indirectly to health and safety, the Legislature may act to meet such needs, because the health and safety of diverse populations are matters of State concern. (Adler v Deegan, 251 NY 467.)
Nor is the statute calling for the removal of feces defective by reason of vagueness or ambiguity. Plaintiffs’ contention that it is impossible to determine what the Legislature meant by the term "remove” is clearly frivolous. It is clear that the statute requires dog owners to clean up after their dogs by removing the "feces” and placing the removed feces in the garbage, trash cans or other proper receptacles. No one is required to carry it home for disposal. A commonsense reading clearly informs any person of ordinary intelligence that he cannot "leave it where it lays”, but must employ suitable means, which as Shakespeare put it, "bends with the remover to remove.” No one need guess or speculate as to the meaning of the statute.
Plaintiffs’ claim that the law infringes on freedom of religion is equally frivolous. Plaintiffs contend that Orthodox Jews are forbidden to pick up litter on the Sabbath. Plaintiffs’ theory is that a religious individual may litter on the Sabbath, but cannot be compelled to pick up his litter. If it is permissible to walk one’s dog on the Sabbath, it is permissible not to defile the streets. Works of necessity are permitted. Moreover, even Jewish infants are not required to stay in soiled diapers all day Saturday. Since cleanliness is next to Godliness, it is doubtful whether an all-seeing and benevolent Deity would approve the desecration of public places in the name of orthodoxy. Even where a recognized religious practice is inimical to public health or morals, such a practice may be overrid *1082 den. (Reynolds v United States, 98 US 145.) "Conduct remains subject to regulation for the protection of society.” (Cantwell v Connecticut, 310 US 296, 304.) The right to practice religion freely does not include the liberty to expose others to disease or death. (People v Pierson, 176 NY 201; Jacobson v Massachusetts, 197 US 11.) The sacred cow may wander without let or hindrance and leave its dung on the streets of cities in India; whatever the claims of religion, individuality and liberty the dog may not do so on the streets of New York and Buffalo.
Insofar as plaintiffs argue that the statute may create hardships for infirm and disabled dog owners, it rests in the assumption that stooping or bending is necessary for compliance; however, there are long-handled devices available which would obviate that necessity. Certainly discretion in enforcement will be used — the blind and the crippled are not going to be ticketed and hailed into court by every passing policeman. Moreover, assuming that certain people will be inconvenienced, the question is whether inconvenience to a few should be permitted to continue to impinge upon the health or welfare of the general public. Uniformly, the courts have ruled otherwise. (Rubin v Hevro Realty Corp., 50 AD2d 529; De Pina v Educational Testing Serv., 31 AD2d 744; Colgate-Palmolive Co. v Erie County, 68 Misc 2d 704.)
Plaintiffs further urge that the statute, as a State legislative enactment, violates the principles of home rule as embodied in article IX of the New York State Constitution. While that article calls for a "home rule message” by the local legislative body or executive on matters relating to the "property, affairs or government” of any locality, matters of State rather than local concern may be the subject of general or special laws enacted by the State Legislature. (Wambat Realty Corp. v State of New York, 41 NY2d 490, 493; NY Const, art IX, § 3, subd [a], par [3].) Matters of public health do not relate to the "property, affairs or government” of a locality, and the State is not pre-empted from taking appropriate action, even though the problem may be localized. (Adler v Deegan, 251 NY 467, supra; City of Buffalo v New York State Public Employment Relations Bd., 80 Misc 2d 741.)
All the arguments raised by plaintiffs are on equally tenuous and unsupportable grounds. They do not purport to speak for all dog owners, most of whom have recognized the necessity for imposition of this additional burden upon them. By *1083 and large they have complied with the law, and in the one year since the statute went into effect there has been a noticeable improvement in the city’s streets and sidewalks. With 600,000 dogs in New York City, only slightly more than 1,000 summonses have been issued. New Yorkers can once again hold their heads high.
The dire predictions that thousands of dog owners would abandon their pets rather than assume the burden of cleaning up after them have not come to pass. Such statements do dishonor to the legion of warmhearted and loyal dog lovers. The law, as has been pointed out, creates no new hazards for the dog (as did impoundment, vaccination and quarantine), but in fact reduces the hazards the dog must confront in its diurnal and nocturnal peregrinations about the city.
As the court has found each constitutional challenge to be frivolous and no issues of fact have been shown to exist, summary judgment is granted in favor of defendants declaring the statute to be constitutional and dismissing the complaint insofar as it seeks injunctive relief.
*1084 I