In the Matter of ROBERT B. MARCUS et al., on Behalf of Themselves and All Others Similarly Situated, Respondents, v MORTON BARON, as Presiding Supervisor of the Town of Ramapo, et al., Appellants.

In the Matter of ROBERT B. MARCUS et al., Respondents, v MORTON BARON, as Presiding Supervisor of the Town of Ramapo, et al., Appellants.

Second Department, December 31, 1981

APPEARANCES OF COUNSEL

*Herschel Greenbaum (Robert H. Freilich* of counsel), for appellants.

*Krashes, Ross & Gess (Frank I. Brown* of counsel), for respondents.

OPINION OF THE COURT

TITONE, J.

Essentially, the issue presented on appeal is whether the appellant town, through its town board, had the power to adopt a local law requiring not only that any proposed

incorporation of a village within the town borders comply with the provisions of section 3-302 of the Village Law which pertain to village officers and elections, but, in addition, that the proposed incorporation be in the over-all public interest of the territory proposed to be incorporated, the remaining area of the town, and any school or fire district, etc., situated wholly or partly within the territory to be incorporated (Local Laws, 1967, No. 3 of Town of Ramapo, entitled "Village Incorporation Law of the Town of Ramapo"). Subsumed in such issue are questions pertaining to (a) the purported pre-emption of the local law by provisions contained in article 2 of the Village Law (entitled "Incorporation"), and (b) whether the local law constitutes a valid exercise of the town's constitutional and statutory responsibilities regarding Federal, State and regional planning in land use.

Petitioners in these CPLR article 78 proceedings are among more than 500 persons who signed an application for the incorporation of the Village of Wesley Hills, which would be situated entirely within appellant Town of Ramapo. After a hearing, the Town Supervisor, appellant Morton Baron, held that the petition was legally insufficient in that, *inter alia,* it did not contain the allegations required under the challenged local law, namely, that the proposed incorporation is in the over-all public interest of (1) the territory proposed to be incorporated, (2) the remaining town area, and (3) any school, fire and other improvement districts wholly or partially within the area intended to be incorporated.

## HISTORY

Before delving into the underlying facts and questions of law in this case, we believe it advisable to give a brief history of efforts by the appellant town within the recent past to meet the problems resulting from a dramatic increase in population. Amongst such problems is the duty of the town to provide additional municipal facilities and services.

Concerned with the ever increasing demands placed upon its already inadequate facilities by a burgeoning

population, the Town of Ramapo, in 1964, applied for a Federal grant to develop a master plan. Preparation of the plan included a four-volume study of the existing land uses, public facilities, transportation, industry and commerce, housing needs and projected population trends.

The proposals appearing in the study were adopted in July, 1966, pursuant to section 272-a of the Town Law, and were implemented by a master plan. The master plan was followed by the adoption of a comprehensive zoning ordinance and, also, a capital budget providing for development of improvements specified in the master plan within the next six years. The town board later adopted a capital program providing for the location and sequence of additional capital improvements for the 12 years following the 6-year life of the capital budget. Thus, the two plans, encompassing an 18-year span, detailed the capital improvements projected for maximum development and conformed to specifications set forth in the master plan, the official map and the drainage plan (see *Matter of Golden v Planning Bd. of Town of Ramapo,* 30 NY2d 359, 366-367).

In order to phase residential development to the town's ability to provide essential services and facilities over the 18-year period, the town board, in 1969, amended the town's zoning ordinance by adding section 46-13.1. Under that amendment, prior to the application for plat approval, a residential developer is required to secure a special permit· or variance. The standards for the issuance of special permits require the availability to the proposed subdivision plat of five facilities or services, namely sanitary sewers or approved substitutes, drainage facilities, improved parks or recreation facilities, including public schools, State, county or town roads, and firehouses. In upholding the constitutionality of the zoning amendment, as containing "proper zoning techniques, exercised for legitimate zoning purposes", the Court of Appeals, in *Matter of Golden v Planning Bd. of Town of Ramapo (supra,* p 371), held that it was within the delegated authority of the town to determine the lines along which development should proceed, even though it may divert that growth from its natural course.

VILLAGE INCORPORATION LAW OF TOWN OF RAMAPO
(LOCAL LAW NO. 3 OF 1967)

Disturbed that new villages formed within the unincorporated area of the Town of Ramapo would have a detrimental effect on the afore-mentioned comprehensive plan, the town board in 1967 enacted article 45 of the Town Code, entitled "Village Incorporation Law of the Town of Ramapo" (Local Law No. 3 of 1967). Section 45-3 provides the following:

"Petition for incorporation.

"A. Every petition for incorporation of a village shall include all the requirements contained in Section 3-302 of the Village Law of the State of New York.

"B. It shall further contain allegations that the proposed incorporation is in the overall public interest (1) of the territory proposed to be incorporated; (2) of the remaining area of the local government in which such territory is located; and (3) of any school district, fire district or other district corporation, fire protection district or town improvement district, situated wholly or partly in the territory to be incorporated."

Sections 45-4 through 45-7 contain provisions for a hearing before the Town Supervisor on an application for incorporation of a village, the rendering of a report on the application by the supervisor to the town board, a determination by the town board after a meeting based upon the supervisor's report, and a final decision by the supervisor upon authorization of the town board.

VILLAGE LAW, ARTICLE 2

The provisions of article 2 of the Village Law, entitled "Incorporation", which petitioners allege, *inter alia,* preempt enforcement of the subject local law, are stated verbatim or summarized as follows:

"§ 2-202. Petition for Incorporation * * *

"b. Contents of petition. The petition shall contain the following information:

"(1) An allegation of the basis on which the petition is signed.

"(2) The name of the proposed village.

"(3) An allegation that such territory contains a population of at least five hundred regular inhabitants.

"(4) The manner in which the area requirements of section 2-200 of this article are satisfied.

"(5) A designation of at least one but no more than three persons, giving full names and addresses, on whom and at which addresses all papers required to be served in connection with the proceeding for incorporation, shall be served. A majority of such designees must reside in such territory.

"(6) Each page of the petition and all exhibits and certifications shall be securely fastened together." (Village Law, § 2-202, subd 1, par b.)

Section 2-206, entitled "Proceeding on hearing", sets forth, *inter alia*, objections which may be presented to the Town Supervisor at a hearing as to the legal sufficiency of a petition for incorporation. The grounds for such objections are, *inter alia*, lack of qualification of a signatory of the petition, insufficient number of signatures thereon, and territorial and population deficiencies.

Under section 2-208, entitled "Decision as to legal sufficiency of petition", the Town Supervisor, is required to determine whether the petition for incorporation complies with the requirements of article 2 of the Village Law.

SUPERVISOR'S REPORT AND DECISION

After summarizing the testimony adduced before him at the hearing on the petition to incorporate the Village of Wesley Hills, the Town Supervisor held that the instrument was defective and legally insufficient for the following four reasons:

(1) There was no allegation of a proper legal basis on which the petition was signed, i.e., no allegation that it was signed by 20% of the residents of such territory qualified to vote for town officers, or by the "owners of more than 50% in assessed valuation of the real property in such territory" (see Village Law, § 2-202, subd 1, par a, cls [1], [2]; § 2-206, subd 1, pars b, c).

(2) There was an impermissible reference in the petition to two affidavits with respect to the certification of the number of signatories and their submission as exhibits to the petition.

(3) The impermissible inclusion of town-owned property within the territory sought to be incorporated.

(4) The proposed incorporation was not in the over-all public interest, and the petition for incorporation did not contain allegations to the effect that it was.

Elaborating on his finding that the granting of the petition to incorporate the Village of Wesley Hills would not be in the over-all public interest, both within and without the proposed village, the Town Supervisor, in his report to the town board, gave the following reasons for such a conclusion:

(1) An additional layer of government, with its attendant tax increases, would be a burden upon the people in the proposed village.

(2) The town tax basis would be eroded to the detriment of its bonding ability, while the proposed village would be too small to warrant bonding at a favorable rate.

(3) Phase three of the town's sewer program could be fatally affected with the loss of millions of dollars of State and Federal aid and the inability to provide for sanitary and safe waste disposal.

The Town Supervisor also reported that sewers were desparately needed within the proposed village area, and that while some residents therein did enjoy sewer service, many others did not have such service although they had been paying for it for many years. It was his belief that the Town of Ramapo had a moral and legal obligation to provide sewer service for the latter group since the residents had, in fact, been paying for it. He also opined that the impact of the proposed village upon the drainage system with the unquestioned rush to build, *"would seriously affect the controlled growth program* [of the town] and render this national model a nullity within a 3.39 square mile area." (Emphasis supplied.) Finally, the Town Supervisor asserted that as a result of the incorporation of the Village of Wesley Hills, zoning controls for all of the residents of the town would be seriously impaired and would potentially require a total revision both of the completed master plan and the proposed new zoning law.

## DETERMINATION OF SPECIAL TERM

In granting petitioners' applications and annulling the decision of the Town Supervisor, Special Term (106 Misc 2d 71) found that the objections sustained by the latter with respect to the inclusion of affidavits with the petition for incorporation certifying the number and qualifications of signers of the petition were without merit since there was nothing in article 2 of the Village Law precluding their inclusion. Special Term set aside the finding of the supervisor upholding the objection to the alleged defect in the petition concerning the number of residents signing the petition. According to Special Term, there was nothing misleading about the petition of incorporation; nor was there any dispute about the number and qualifications of those who signed it. Similarly it rejected the supervisor's finding that the petition was defective because it included town-owned property since subdivision 1 of section 2-200 and section 2-206 (subd 1, par d) of the Village Law only exclude a "part of a city or village". We concur with Special Term's determination overruling the supervisor's decision sustaining the three aforesaid objections. However, we disagree with Special Term's further conclusion that Local Law No. 3 is pre-empted by, and inconsistent with, article 2 of the Village Law, and therefore violates section 2 (subd [c], par [ii]) of article IX of the New York State Constitution[1] and also section 10 (subd 1, par [i]) of the Municipal Home Rule Law.[2]

## DETERMINATION ON APPEAL

It is true, as petitioners argue, that where the State law indicates a purpose to occupy an entire field, local laws pertaining to that field are pre-empted and thus prohibited regardless of whether they duplicate or otherwise conflict with the State law *(People v Wilkerson,* 73 Misc 2d 895, 901; see *Robin v Incorporated Vil. of Hempstead,* 30 NY2d 347). The intent to pre-empt may be deduced from an

---

1. NY Const, art IX, § 2, subd [c]: "(ii) every local government shall have power to adopt and amend local laws *not* inconsistent with * * * any general law relating to * * * the property, affairs or government" (emphasis supplied).

2. Municipal Home Rule Law, § 10, subd 1: "(i) every local government shall have power to adopt and amend local laws not inconsistent with the provisions of the constitution or *not inconsistent with* any general law relating to its property, affairs or government" (emphasis supplied).

elaborate statutory scheme or from general State policy (see *Wholesale Laundry Bd. of Trade v City of New York,* 17 AD2d 327, 330, 18 AD2d 968, affd 12 NY2d 998).

However, the mere fact that a local law deals with some of the matters touched upon by State law does not necessarily render the local law invalid unless the State has clearly evidenced a "desire or design" to occupy the entire field (cf. *People v Webb,* 78 Misc 2d 253, 256; *Wholesale Laundry Bd. of Trade v City of New York,* 17 AD2d 327, *supra*).

The concept of pre-emption is limited to situations where the intention is clearly to preclude the enactment of inconsistent local laws (see *People v Judiz,* 38 NY2d 529, 532). Though a local law may be different, it will be sustained "if it bears a 'substantial relation to matters within the field where legislative power is vested in the local legislative body * * * by the Constitution and statutes of New York * * * [and is] * * * reasonably calculated to achieve a legitimate public purpose'" *(Belle v Town Bd. of Town of Onondaga,* 61 AD2d 352, 357-358).

In a similar vein, it should be noted that although the Constitution of this State prohibits local laws which are inconsistent with it or any general law (NY Const, art IX, § 2, subd [c], par [ii]; see, also, Municipal Home Rule Law, § 10, subd 1, par [i]), the fact that provisions of a local law or ordinance are different from, or not identical with, a State statute encompassing the same general area does not necessarily render the local law invalid if the area has not been pre-empted (cf. *Wholesale Laundry Bd. of Trade v City of New York,* 17 AD2d 327, *supra*).

A local law may cover the same subject matter embraced in State legislation by supplementing the general law with additional reasonable requirements (cf. *Robin v Incorporated Vil. of Hempstead,* 30 NY2d 347, *supra*). Where a local law imposes greater restrictions or conditions in connection with regional comprehensive plans, such law neither conflicts with, nor is it pre-empted by, State law (cf. *Monroe-Livingston Sanitary Landfill v Town of Calendonia,* 72 AD2d 957, 958). To define the word "inconsistent" narrowly as meaning merely "different" would vitiate the

flexibility of home rule as enunciated by the Legislature and the executive branch in enacting the Municipal Home Rule Law *(Town of Clifton Park v C.P. Enterprises,* 45 AD2d 96, 98). Moreover, it has also been held that even where inconsistency with a general law is shown, the local law will be upheld despite the inconsistency if there is a special local problem supporting the variance (see *Robin v Incorporated Vil. of Hempstead,* 30 NY2d 347, 351, *supra).*

Contrary to the position taken by Special Term, we conclude that in enacting article 2 of the Village Law, the State Legislature neither expressly nor impliedly intended to preclude enactment of all local laws pertaining to incorporation of villages in which conditions are set forth other than those found in the State law. An analysis of article 2 reveals that included therein are, *inter alia,* minimum geographical and population requirements, procedural requirements relating to petitions for incorporation, and provisions concerning the scheduling of elections on the issue of incorporation and for village officers, the extent of legal and financial responsibilities of the town after incorporation, and the effect of incorporation on districts entirely within the newly created village. Absent from article 2 is any hint or suggestion that the State Legislature ever intended or contemplated that in passing upon an application for incorporation of an area within a town as a village, no consideration be given by the responsible town officials to the possible deleterious effects of incorporation upon town plans which are both in accordance with and reflect not only local conditions, but also broad State-wide and national policy in the field of long range and comprehensive planning in land use.

That the town board enacted Local Law No. 3 setting forth additional conditions for the proposed incorporation of a village in order to preserve, enhance and implement the town's comprehensive master plan, is evident from the remarks of John P. McAlevey at the December 17, 1979 hearing before the Town Supervisor on the petition for incorporation. McAlevey, who had been the Supervisor of Ramapo in the 1960's when the comprehensive plan was adopted, stated the following:

"As a result of a *[sic]* extraordinary, unplanned and uncontroled *[sic]* growth in the fifties and early sixties, the Town of Ramapo found itself at the mercy of speculative developers who had no regard for the consequences to the community of what they were doing. The Town of Ramapo consequently, circa 1966-67 embarked on a program of very well-thought-out, integrated and sophisticated controls. The Town adopted a comprehensive Master Plan to guide its future development; adopted an Official Map and a capital program so as to provide for the maximum orderly, adequate and economical development of its future residential, commercial, industrial and public land uses and community familities *[sic]*. It expended tens of thousands of dollars in the development of comprehensive engineering studies related to and in justification of the master plan. All of this based upon certain assumptions as to density and zoning, which assumptions were incorporated in a comprehensive zoning ordinance which applied an integrated approach to planning and zoning in the whole of the unincorporated area of the Town.

*"It was in direct pursuit of that policy that the Town Board adopted Local Law # 3 of 1967 because the investment of the people of the Town of Ramapo would be thwarted, the public resources squandered, and the thoughtfully constructed and well-executed master plan and zoning policies would be frustrated by the rise of new enclaves within the unincorporated area wherein the comprehensive plan and the complimentary [sic] zoning ordinance would be no longer applicable.*

"The above principles are still applicable. The Town of Ramapo is still renowned in planning circles throughout the United States for the consistency of its policies and the farsighted planning and development programs which it has initiated. All of this would be frustrated by the creation of new incorporated areas within the Town, especially when these areas are created specifically for the purpose of escaping controls adopted in the best interests of all of the people of the Town of Ramapo." (Emphasis supplied.)

Furthermore, the legitimate concern of the town board that its power to implement its long-range master plan and zoning policies conceivably would be weakened and per-

haps (according to McAlevey) "frustrated" by incorporation of its unincorporated areas into villages, thus, warranting enactment of an ordinance such as Local Law No. 3, may be inferred from the following matter contained in a footnote in *Matter of Golden v Planning Bd. of Town of Ramapo* (30 NY2d 359, 366, n 1, *supra*).

In the period 1940 to 1968, population in the unincorporated areas of Ramapo increased 285.9%. Between 1950 and 1960, the increase was 130.8%, while from 1960 to 1966, it was 78.5% and from 1966 to 1969, it was 20.4%, all in the unincorporated areas. In terms of real numbers the population of the town was 58,626 in 1966. Projected figures approximate a total town population of 120,000 by 1985. Moreover, an annual growth rate of some 1,000 residential units had been experienced in the unincorporated areas of the town.

It must also be observed that, besides the appellant town, others have taken cognizance of what has been perceived as the problem of fragmentation of local governing bodies by the incorporation of smaller municipal entities within existing and emerging metropolitan areas. For example, the New York Joint Legislative Committee on Metropolitan and Regional Areas Study in its 1967 report stated: "'The most pressing problem of local government in metropolitan areas may be stated quite simply. The bewildering multiplicity of small, piecemeal, duplicative, overlapping local jurisdictions cannot cope with the staggering difficulties encountered in managing modern urban affairs * * * *If local governments are to function effectively in metropolitan areas, they must have sufficient size and authority to plan, administer and provide significant financial support for solutions to area-wide problems.'"* (NY Legis Doc, 1967, No. 42, p 19; emphasis supplied.)

In an article entitled Standards for Municipal Incorporations on the Urban Fringe (36 Tex L Rev 271), Daniel R. Mandelker, director of the Council of the Round Table of Local Government Law of the American Association of Law Schools, made the following pertinent observation (p 271): "[I]ncorporation on the urban fringe, which brings with it the proliferation of satellite communities in homogenous economic and social areas, can create chaos in the

government of a metropolitan complex which may become impossible of resolution."

To prevent the incorporation of multiple, small political entities, Mandelker suggests certain standards that should be observed in any proposed incorporation. Some of those standards, which to a large degree have been adopted by the appellant town in Local Law No. 3, are the following:

(1) The entire incorporating area should pass a "community of interests" test.

(2) Consideration of the effect of a new incorporation on the ability of other communities in the area to carry out their governmental functions.

(3) The need of the incorporating area to pay for the required services.

(4) Consideration of the diminished efficiency and economies of scale when the incorporating area is removed from a larger township.

In *Bennett v Garrett* (132 Va 397, 406), the Supreme Court of Appeals of Virginia, in determining that the common good of members of the community outside the area proposed to be incorporated as a town should be considered, as well as of those inside the area, made the following observations: "There is room under the evidence to doubt whether the incorporation of the town applied for would in fact * * * promote the interests of the inhabitants of the proposed corporate area, but conceding that the plaintiffs are right in this respect, and conceding further that a very large majority of such persons are in favor of the charter * * * *the general good of the whole community affected demands a denial of the petition.*" (Emphasis supplied.)

Attention should also be directed to the fact that in a converse, but nevertheless related, field, i.e., the proposed annexation of a contiguous land area into an existing municipality, courts have held in effect, on more than one occasion, that the over-all public interest of those living outside the existing lines, as well as of those living inside the lines, must be considered. Thus, in *Matter of Board of Trustees of Inc. Vil. of Warwick v Town Bd. of Town of Warwick* (56 AD2d 928-929), this court stated, *inter alia:*

"The Court of Appeals has said that one of the elements to be considered in an annexation proceeding is 'whether or not the annexing local government and the territory to be annexed have the requisite unity of purpose and facilities to constitute a community' * * * Judged by this standard, the report of the Referees recommending annexation has merit. *Nevertheless, a cautionary note must be added. Annexations of territories pose important issues, bearing on the proper geographic and economic division of the bulk of land lying outside of centers presently served by the facilities necessary for land development. Piecemeal annexation, benefiting one property owner alone, may well result ultimately in municipal boundaries not in accordance with proper planning criteria. Hence, wherever possible, annexation should not follow the fortuituous boundary lines* of the land of a single owner who seeks immediate advantage to himself, *but the broader lines of divisions based on the planning aspects of the annexation.*" (Emphasis supplied; see, also, *Town Bd. of Town of Brighton v City Council of City of Rochester,* 59 AD2d 1041.)

In determining whether annexation is just and equitable, it must be considered broadly, having in view the highest interests of all concerned, including the needs and growth of the locality in the future, and not only the existing situation *(Van Arsdale v Cain,* 154 NE2d 219 [Ohio]).

In another related area of the law, namely the merger of two or more villages into a borough, it has been held, *inter alia,* that the question of whether such entities may be incorporated into one borough depends on whether, together with appurtenant lands, they form one harmonious whole with interests in common which can be served by borough government *(Eden Park Borough Incorporation,* 158 Pa Super Ct 40).

Admittedly the town is a political subdivision of the State, whose creation, powers and duties are derived from the Constitution and statutory law. It is likewise true that included in the duties of town officials such as the Town Supervisor and town board in this proceeding, is the obligation to govern the town so as to best provide for its general welfare and good order and to carry on various

activities and provide public services usually considered to be the responsibility of town government.

To discharge these responsibilities, both the Town Supervisor and town board have such powers as are specifically enunciated by law and those which are reasonably and necessarily implied therefrom. It follows, therefore, that in order to discharge their responsibilities in an efficient and appropriate manner, the officials in question must necessarily be allowed a reasonable latitude of discretion (cf. *Cottonwood City Electors v Salt Lake County Bd. of Comrs.*, 28 Utah 2d 121, 123).

In the matter at bar petitioners argue, *inter alia,* that because article 2 of the Village Law sets forth population and territorial requirements with respect to the area desired to be incorporated as a village, as well as other ministerial and procedural details, it follows that the duty of the Town Supervisor and town board is simply a ministerial one of determining the sufficiency of the petition; and once deciding that the petition complied with the provisions of article 2, no alternative was available other than the approval of the petition and the scheduling of an election for the establishment of the Village of Wesley Hills. What petitioners have not addressed, however, is that under section 272-a of the Town Law, a town planning board (whose members are appointed by the town board) is empowered to "prepare * * * a comprehensive master plan *for the development of the entire area of the town,* which master plan shall show desirable streets, bridges and tunnels and the approaches thereto * * * and such other features existing and proposed *as will provide for the improvement of the town and its future growth, protection, and development, and will afford adequate facilities for the* * * * *comfort, convenience, public health, safety and general welfare of is population*". (Emphasis supplied.)

In accordance with such statute, the Planning Board of the Town of Ramapo established a comprehensive plan for controlled growth which, according to the Court of Appeals in *Matter of Golden v Planning Bd. of Town of Ramapo* (30 NY2d 359, *supra),* was based upon the concept of timing and sequential controls, that is, *all* residential development must proceed in accordance with the provision of

adequate municipal facilities. Acting in tandem with the planning board, the town board, obviously under its statutory power to promote the health, safety and general welfare of the entire town (especially its unincorporated areas) and to enact regulations in accordance with the comprehensive plan for controlled growth (see Town Law, §§ 261, 262, 263), not only adopted an ordinance (§ 46-3, as amd) providing for phased residential development based on the town's ability to provide essential facilities and services (as discussed in the *Golden* case), but earlier also adopted Local Law No. 3 for the express purpose, according to its then Town Supervisor (McAlevey), of preventing its master plan and zoning policies from being *"frustrated by the rise of new enclaves within the unincorporated area wherein the comprehensive plan and the complimentary [sic] zoning ordinance would be no longer applicable"*. (Emphasis supplied.)

Thus we are of the opinion, as stated by the Court of Appeals in *Golden (supra,* p 371) with respect to the town's special permit ordinance (§ 46-13.1), that Local Law No. 3 constitutes a proper zoning technique, executed for legitimate zoning purposes, and a necessary concomitant to the municipality's "recognized authority to determine the lines along which local development shall proceed". Indeed, it would seem to be a total anomaly to hold that, although a town may control subdivision in all of its residential districts with particular emphasis in its unincorporated areas, it is powerless to address itself to the possible diminution or destruction of such control by the incorporation of smaller municipal entities within its boundaries.

Therefore, we conclude that Local Law No. 3, rather than being inconsistent with article 2 of the Village Law, constitutes a complementary or a consistent extension of such law and is furthermore a refinement of over-all State policy (see *Sonmax, Inc. v City of New York,* 43 NY2d 253, 257; *Metropolitan N. Y. Retail Merchants Assn. v City of New York,* 60 Misc 2d 805).

We also believe that the town board's action in enacting Local Law No. 3 may be sustained under section 10 of the Municipal Home Rule Law which provides, *inter alia,* that every local government "shall have power to adopt and

amend local laws not inconsistent with the provisions of the constitution or not inconsistent with any general law, relating to \* \* \* [its] property, affairs or government", specifically, to adopt and amend local laws for the "protection and enhancement of its physical and visual environment" (Municipal Home Rule Law, § 10, subd 1, par [ii], cl a, subcl [11]).

Moreover whatever merit exists to the argument that the enactment of Local Law No. 3 might be inconsistent with State law has been rendered academic with the passage in 1976 of an amendment to section 10 of the Municipal Home Rule Law. The amendment in question expressly delegates to a local government the power to adopt or amend local laws, including the right to amend or supersede any statutory provision adopted by the Legislature in the Town Law (Municipal Home Rule Law, § 10, subd 1, par [ii], cl d, subcl [3], as amd by L 1976, ch 805). We disagree with Special Term's refusal to apply such amendment in this matter on the ground that the local law was enacted in 1967, long before the enactment of the legislative amendment, at a time when the right of supersession did not exist, and there was nothing contained in the amendment to indicate a legislative intent that it was to have retroactive effect. In our opinion such determination was erroneous. The issue of retroactivity has no relevancy. Generally, a court is obligated to decide a case on the law as it exists at the time of its decision. Thus, in this instance, in determining whether Local Law No. 3 was valid, Special Term should not have disregarded the recent statutory amendment to the Municipal Home Rule Law, especially since it would seem to be a complete answer to the assertion that Local Law No. 3 is unconstitutional and inconsistent with State law (cf. *Mount St. Mary's Hosp. of Niagara Falls v Catherwood,* 33 AD2d 635, affd 26 NY2d 493).

Accordingly, since we hold Local Law No. 3 to have been validly enacted, and since the petition for incorporation failed to comply with its provisions, the judgment of Special Term should be reversed, on the law, the local law declared valid, and the proceedings otherwise dismissed, with costs.

HOPKINS, J. (dissenting). I dissent and vote to affirm.

The question before us deals with the quantity and quality of power delegated to municipalities by the State. Originally and historically, a municipal corporation is a political subdivision of the State, created by the Legislature for the exercise of such governmental powers as may be entrusted to it *(People ex rel. Wood v Draper,* 15 NY 532, 562; *Trenton v New Jersey,* 262 US 182; cf. *Bank of Chenango v Brown,* 26 NY 467; see Frug, The City as a Legal Concept, 93 Harv L Rev 1059, 1104, 1109-1112); the method of creating municipal corporations is controlled by the Legislature *(Town of Hornellsville v City of Hornell,* 38 AD2d 312, 315; 1 McQuillin, Municipal Corporations [1971 rev ed], § 3.17, p 247, § 3.18, pp 248-250), and the legislative authority is plenary and exclusive *(People v Snedeker,* 160 NY 350, 356; *People ex rel. Clancy v Board of Supervisors of Westchester County,* 139 NY 524, 529; *Matter of LaGuardia v Smith,* 288 NY 1, 7), even to the extent of regulating the manner of increasing or diminishing the territory of the municipality *(Adriaansen v Board of Educ.,* 222 App Div 320, 323-324, affd 248 NY 542; see, also, *People ex rel. Village of Spring Valley v Schroeder,* 189 Misc 324, affd 273 App Div 789). When the interests of municipalities collide, such as in the case of annexation, the Legislature has enacted statutory directions for the resolution of disputes (General Municipal Law, § 701 *et seq.;* cf. *Matter of City Council of City of Mechanicville v Town Bd. of Town of Halfmoon,* 27 NY2d 369). There is no inherent right to self-government; though powers may be shared by the State and the municipal unit, the Legislature finally is paramount *(Massie v Brown,* 84 Wn 2d 490).

Presently, our Constitution lodges the creative power of local governments in the Legislature "in such manner as shall secure to them the rights, powers, privileges and immunities granted to them" (NY Const, art IX, § 2, subd [a]). Towns and villages are both local governments (NY Const, art IX, § 3, subd [d], par [2]). There is no indication in this language that any priority or favor has been conferred on one form of local government over another; indeed, the implication is that, except as the Legislature may provide, their rights are to be treated equally. It is

true that a village, unlike a town or county, is a voluntary corporation in the sense that it comes into being by vote of the electorate *(Village of Kenmore v County of Erie,* 252 NY 437, 442), but this distinction, so far as the Constitution divulges, leads to no discrimination for or against a village or in the creation of a village.

Hence, we must look to the provisions of the Constitution and the Municipal Home Rule Law to determine whether a town may adopt a local law changing the conditions enacted by the Legislature for the creation of a village. Again, there is nothing either in the Constitution or in the statute which expressly gives the power to a town to adopt a local law which adds to the conditions enacted by the Legislature for the creation of a village (Village Law, art 2; see, specifically, §§ 2-206, 2-208). Accordingly, the power of the town to adopt such a local law, if it exists at all, must lie in necessary implication, although we should expect that such an important and fundamental matter as the creation of a local government would not be removed from the Legislature except by express provision. In construing the constitutional and statutory words, we must read them in the light of the cases antedating the 1963 home rule amendment *(Wambat Realty Corp. v State of New York,* 41 NY2d 490, 497).

The Constitution provides that "every local government shall have power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to its property, affairs or government" (NY Const, art IX, § 2, subd [c], par [i]). In addition, every local government is granted the power to adopt and amend local laws on certain enumerated subjects, none of which include the creation of local governments, except to the extent that the Legislature may restrict the adoption of such a local law (NY Const, art IX, § 2, subd [c], par [ii]). One of the subjects so described upon which the appellant town relies reads: "The government, protection, order, conduct, safety, health and well-being of persons or property therein" (NY Const, art IX, § 2, subd [c], par [ii], cl [10]). This statement, however, simply describes the general police power and cannot be considered to qualify the traditional authority of the Legislature to create municipal

corporations. Moreover, the Constitution makes manifest that nothing in the Bill of Rights for Local Governments (NY Const, art IX, § 1) "shall restrict or impair any power of the legislature in relation to * * * [m]atters other than the property, affairs or government of a local government" (NY Const, art IX, § 3, subd [a], par [3]).

The provisions of the Municipal Home Rule Law are no more declaratory of the power of the appellant town to adopt the local law in question. The statute tracks the language of the Constitution relative to the power to adopt local laws (Municipal Home Rule Law, § 10, subd 1, pars [i], [ii]). It grants to a town, in addition, the power to adopt a local law concerning assessments and their review (Municipal Home Rule Law, § 10, subd 1, par [ii], cl d, subcls [1], [2]). Further, the Eckert amendment (L 1976, ch 365) to the statute (Municipal Home Rule Law, § 10, subd 1, par [ii], cl d, subcl [3]), providing for the amendment or super-session of any provision of the Town Law by local law, unless expressly prohibited by the Legislature, does not empower the appellant town to adopt the challenged local law, since the local law applies not to the Town Law but to the Village Law, to which the Eckert amendment does not apply.

The power of the appellant town to adopt the local law does not arise by necessary implication, in any event, in the light of the express constitutional language. A local government may adopt local laws not inconsistent with the provisions of "any general law relating to its property, affairs or government" (NY Const, art IX, § 2, subd [c], par [i]). The Village Law is a general law (NY Const, art IX, § 3, subd [d], par [l]; Municipal Home Rule Law, § 2, subd 5). Thus, the necessary implication of the constitutional language is to the contrary of the meaning urged by the appellant town. "The drafters did not invent a new arrangement of words; they imported into the new article the old phrase 'property, affairs or government' of a local government. It is unlikely that a term of art so heavily laden with the judicial gloss of the pre-1963 cases (supra) favoring the State's power would have been used had State concerns been contemplated to be subordinate to local powers granted under the Statute of Local Governments"

*(Wambat Realty Corp. v State of New York,* 41 NY2d 490, 497, *supra).* When State-wide interests have been regulated by a general law, a local government may not interfere with its operative effect by a local law (see, e.g., *Floyd v New York State Urban Dev. Corp.,* 33 NY2d 1, 6-7; *Bugeja v City of New York,* 24 AD2d 151, 152, affd 17 NY2d 606; *Town of Junius v Flacke,* 71 AD2d 423, 427; *Schnapp v Lefkowitz,* 101 Misc 2d 1075).

In short, there exists no evidence of constitutional or statutory intent that the power was granted to one form of local government to constrict the initiation of another by the exercise of home rule, any more than the power was granted by the provisions of home rule in effect at the time of *City of New York v Village of Lawrence* (250 NY 429). Hence, Judge LEHMAN's observation then is pertinent now (pp 438-440):

"The creation of the city as a subordinate governmental agency or political institution, and the determination of the territory in which that agency should function, are matters of general public interest, and when the Home Rule Amendment to the Constitution was adopted it was the established policy of the State that the Legislature might by special act exercise its discretion in such matters.

"It is difficult to perceive in that amendment any attempt to limit the powers of the Legislature in the creation of new cities or to change, in this respect, the established policy of the State. The provisions of article VIII, section 1, of the Constitution, recognizing the power of the Legislature to form corporations for municipal purposes by special act, have not been expressly repealed or amended. Limitation upon that power must be found, if at all, in the provisions of section 2 of article XII, which prohibits the Legislature from passing a special or local law 'relating to the property, affairs or government of cities,' except on message from the Governor that an emergency exists.

"It may hardly be doubted that the creation of a new city and the determination of its boundaries do not relate 'to the property, affairs or government of cities' as used in the amended Constitution. These words were used in article XII, section 2, of the Constitution before the Home Rule

Amendment. Then the Legislature might enact special laws relating to such matters, but after a bill was passed by both houses, it was in such case transmitted to the mayor of the city or cities affected, for acceptance or rejection. The intent of these provisions of the Constitution was to provide some measure of protection to a city from possible danger of ill-considered interference by the Legislature in its local affairs. Opportunity was afforded to a city to present objections before a special law relating to its property, affairs or government could become effective, but a non-existent city can have no property, affairs or government, and no officers could voice objections in its behalf. The Legislature was free to create, and did create, new cities by special law, and article XII, section 2, of the Constitution in its original form could have no application to laws passed for that purpose.

"The Home Rule Amendment to the Constitution, as we have pointed out, has enlarged the legislative powers of cities and restricted the legislative powers of the Legislature within the field of matters relating to the property, affairs and government of cities. It has no operation outside of that field, nor has it changed the description of that field contained in the Constitution before the amendment. Its limits remain as they were before, and the creation of cities and definition of the boundaries of the territory under their jurisdiction remain outside of that field. Here the power of the Legislature is plenary."

It may well be, as the appellant town argues, that the symmetry and consequences of its zoning and planning ordinances, passed to control the orderly development of its land and population, will be frustrated by the incorporation of a new village within the town's boundaries. It may well be that the problems engendered by the creation of the village should be addressed by the Legislature. These, however, are questions for the Legislature and not for the courts. We must enforce the Constitution and the statutes in their fair intendment and effect.

On the other side, the Legislature might well consider that to allow towns to adopt local laws raising a variety of conditions to the creation of villages in addition to those imposed by the Legislature, would unduly interfere with

the desirable standard of uniformity of method for the creation of villages throughout the State, and would inaugurate a parochial resistance by towns to new villages through the formation of difficult or oppressive conditions. The Legislature, indeed, reflects the overriding concerns of the people of the State, and its judgment must ultimately resolve the conflicts between municipal segments of the State, rather than to permit a kind of internecine struggle between them. Here the Legislature has not found it appropriate to give to towns any power to regulate the creation of villages.

Since neither by express language nor by necessary implication of the Constitution or statute the appellant town has demonstrated its power to adopt the local law in suit, the judgment of Special Term should be affirmed.

MOLLEN, P. J., and WEINSTEIN, J., concur with TITONE, J.; HOPKINS, J., dissents and votes to affirm the judgment, with an opinion.

Judgment of the Supreme Court, Rockland County, entered July 28, 1980, reversed, on the law, with costs, Local Law No. 3 of 1967 of the Town of Ramapo is declared valid and the proceedings are otherwise dismissed on the merits.